304 So.2d 681 (1974)
Sidney Mack PARKER, Jr., Plaintiff-Appellee,
v.
Glenda Nixon PARKER, Defendant-Appellant.
No. 4779.
Court of Appeal of Louisiana, Third Circuit.
December 16, 1974.
Rehearing Denied January 9, 1975.
Writ Refused February 14, 1975.
*682 Nathan A. Cormie, Lake Charles, for defendant-appellant.
Gravel, Roy & Burnes, by James J. Brady, Alexandria, for plaintiff-appellee.
Before HOOD, CULPEPPER, and WATSON, JJ.
HOOD, Judge.
Sidney Mack Parker instituted this suit against his wife, Glenda Nixon Parker, seeking a divorce on grounds of adultery and demanding custody of their three minor children. Mrs. Parker reconvened, praying for a separation from bed and board and for custody of the children and child support. Judgment was rendered by the trial court in favor of plaintiff, granting a divorce and awarding him custody of the children. Mrs. Parker appealed from that part of the judgment which awarded her husband custody of the children and denied her claim for child support.
The issue presented is whether the trial judge erred in granting custody of the children to plaintiff.
The Parkers were married in 1962, and three children were born of that union, the oldest child being now 10 years of age. Mrs. Parker admits that she engaged in sexual intercourse on three occasions in 1973 and 1974 with a man named Jimmy Hill, who supposedly was a friend of the family. Hill and his wife frequently visited socially with the Parkers.
The first such act took place in the Parker home in Jena, Louisiana, in September, 1973, while the children were in school and Parker was at work. On that occasion Mrs. Parker picked Hill up in her car and brought him to her home. She stated that although they did not specifically plan to engage in sexual relations at that time, she "had a good idea" what would happen when she picked Hill up. The second incident occurred later that same month in an automobile a few miles from Jena. The third act of adultery was committed during the morning of February 28, 1974, at the Parker home, while the children again were in school and Mr. Parker was at his drug store.
Sometime in January, 1974, Parker confronted his wife with rumors he had heard that she was having illicit relations with Hill. Defendant vehemently denied those rumors. Following that confrontation, the parties separated, and Mrs. Parker and the three children moved to the home of defendant's parents in Reeves, Louisiana. Two days later the parties became reconciled and defendant and her children moved back to the family home in Jena, and she resumed living with her husband.
Plaintiff became increasingly suspicious of his wife after their reconciliation, however, and he began checking the speedometer of the automobile she was driving to determine the distance she drove it every day. He concluded that she was traveling more miles every day than she could reasonably account for, and that increased his suspicions. Parker made numerous telephone calls to his home throughout the day to determine if his wife was there, and he frequently demanded explanations from defendant as to why she did not answer the telephone or why the line was busy. Mrs. Parker testified that the constant *683 harassment by her husband "as to what I was doing and why and wherefore" made her "really not care."
In February, 1974, Parker arranged with the telephone company to have an extension line installed in his drug store so that he could listen in on and tape all telephone calls made to his wife at their home. These arrangements were made without his wife's knowledge. The installation of this telephone extension was completed about midday on February 28, and shortly thereafter, on the same day, Parker listened in on and taped a telephone conversation between defendant and Hill, in which they disclosed that they had engaged in an act of sexual intercourse in the Parker home that morning while the children and plaintiff were away. In that telephone conversation defendant indicated to Hill that she would leave her husband, and that she and the children would move to Texas with Hill and would live with him there.
Mrs. Parker testified that prior to that telephone conversation with Hill she had discovered that her husband had had an extension phone put in, that she suspected that plaintiff was listening in on the conversation, that she thought that plaintiff and Hill had conspired to trap her into admitting adultery, and that she made statements to Hill at that time which were not true, thinking that "it would have gotten next to him (Parker)." The trial judge found it difficult to assess that telephone conversation, and concluded that "it was either evidence of gross irresponsibility, insensibility or a calculated, deliberate act to terminate the marriage, regardless of possible ancillary consequences."
On the afternoon of February 28, after overhearing and taping that telephone conversation, Parker returned home from work and suggested to his wife that they take a ride in his automobile, leaving the children at home, representing to her that he wanted to show her some property he had just bought. He took a loaded gun with him, explaining to defendant that he expected to shoot armadillos. The gun was placed on the front seat of the car between them as they drove out of town. While on that trip Parker confronted his wife with the fact that he had over-heard her telephone conversation with Hill that day. He thereupon drove to a restaurant operated by Hill and told defendant to get out of the car there. Defendant refused. Plaintiff thereupon drove to the sheriff's office, where they discussed the matter with the sheriff, who advised Mrs. Parker to leave the home for a few days in order to avoid violence.
Later that afternoon Parker and the sheriff removed the children from the home, before Mrs. Parker had an opportunity to see them, and defendant reluctantly moved out of the family home. Since that time she has lived with her sister and her parents. Her husband has continued to live in the family home or with his parents in Jena, and he has retained custody of the children.
Mrs. Parker made several attempts to see her children between the date of the separation on February 28 and the date of the trial on March 15, 1974. On March 4, she telephoned her husband advising him that she was coming to see the children. When she arrived at the Parker home, her husband refused to permit her to enter, whereupon she hurled a rock through a window and attempted to gain entrance through that window. Plaintiff, however, prevented her from entering the house, and Mrs. Parker thereupon was arrested and placed in jail.
The record reveals that Mr. Parker had signed an affidavit in the sheriff's office before his wife arrived at the family home on that date, accusing her of disturbing the peace at that home. He obtained a warrant for her arrest before defendant arrived at the home, before she broke the window, and before any of the acts charged in the affidavit were committed.
*684 It is apparent that plaintiff deliberately planned to have his wife arrested before an offense was ever committed. Mrs. Parker was arrested pursuant to that warrant and was put in jail. She was bailed out of jail later that evening, apparently by Hill.
Several witnesses testified at the trial that they had seen Hill's automobile parked in front of the Parker home frequently. A 14 year old child stated that on four or five occasions he had seen Hill visit defendant in her home while plaintiff was not there, that Hill put his arm around defendant once and they went into a bedroom on another occasion. Other witnesses testified that they had seen defendant and Hill riding together in automobiles in Alexandria and on highways outside of Jena. And, one friend of the Parker family warned defendant early in 1973 that she "was going to get herself in bad trouble if she didn't watch her step with this fellow (Hill)." The evidence indicates that Mrs. Parker was indiscreet in her relations with Hill, that a number of people in the community were aware of their clandestine meetings, and that there were rumors of an illicit relationship between them.
The evidence shows that either party to this suit is capable of caring for the children. Although Mrs. Parker does not have sufficient income to do so, her parents and her sister are willing to provide her with a place to live, and Mr. Parker's income is sufficient to provide defendant with adequate support for her offspring. It is apparent that both parents love the children.
The trial judge concluded that the best interest and welfare of the children would be served by awarding custody to the plaintiff-father. In his reasons for judgment the trial judge said:
"First, I find Mrs. Parker is morally unfit. My reasons for this are that her relationship with Mr. Hill is very recent and long continued. Insofar as she has denied her intention to continue the relationship, I view that as similar to some one with an alcohol problem saying he's gone on the wagon.
* * * * * *
"I find that the continuation of the relationship with Mr. Hill must have been calculated or deliberate or both. Whichever it was, it was an act of irresponsibility and this Court questions how she would care for the children in the immediate future and whether or not she will change her role to the extent of becoming a responsible person.
* * * * * *
"By leaving the children with their father their world will be maintained as intact as possible under the circumstances. They will have their children acquaintenances, the community that they know, they will have the home which they have had since February. I think it is in their best interest that this Court should do as little as possible to disturb the world of these children further and I refuse to do so."
We agree with all of the factual findings of the trial court.
The paramount question to be answered in determining to whom the custody of children should be granted is what would serve the greatest advantage, the best interest and the best welfare of the children. Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971); Nugent v. Nugent, 232 So.2d 521 (La.App. 3 Cir. 1970).
Ordinarily the mother's right to the custody of her children, especially when they are of tender age, is preferred to that of the father, and her right to custody should not be denied unless she is found to be morally unfit or otherwise unsuitable. There is a presumption that the best interest and welfare of the children will be served by placing them in the custody of the mother, and it is only in exceptional cases that it will be considered to be to *685 the best interest of the children that their custody be intrusted to the father. Nugent v. Nugent, supra; Hebert v. Hebert, 255 So.2d 630 (La.App. 3 Cir. 1971). Proof of one act of adultery, or even of several acts with the same paramour, does not necessarily render morally unfit a mother who is otherwise suited for custody. Where the mother, however, has consistently engaged in a course of open and public indiscretions in defiance of generally accepted moral principles, and in disregard of the embarrassment and injuries which might be sustained by the children, then the court is justified in depriving her of the care of the children, and in awarding custody to the father or to some other party lawfully entitled to it. Strother v. Strother, 248 So.2d 867 (La.App. 3 Cir. 1971); Lambert v. Lambert, 286 So.2d 390 (La.App. 1 Cir. 1973).
The trial judge has much discretion in awarding the custody of a child whose parents have been legally separated or divorced, and his conclusions are entitled to great weight. The determinations made by the trial judge as to custody, therefore, will not be set aside unless it clearly appears that there has been an abuse of discretion or unless the judgment awarding custody has been based upon incorrect legal principles. Hebert v. Hebert, supra; Fulco v. Fulco, supra; Messner v. Messner, 240 La. 252, 122 So.2d 90 (1960).
We have reviewed the factual findings of the trial court in the instant suit with the above principles of law in mind, and have concluded that the trial judge did not abuse the discretion vested in him in awarding the custody of the children to plaintiff.
The evidence shows that Mrs. Parker committed adultery with Hill on three occasions, two of which took place in her home. The last such incident took place after defendant knew that there were rumors of her illicit relations with Hill, and after she had been confronted with those rumors by her husband. She and her husband, in fact, had separated because of these persistent rumors. She knew that her husband was constantly checking on her because of his suspicions, and yet she deliberately picked Hill up and brought him to her home where the act was committed. She must have been aware of the risk she was taking, and of the fact that her marriage would probably terminate if she were detected. She, in fact, testified that she thought about the effect her affair with Hill would have on her family, and she stated, "Yes, I saw him after I thought about it." She testified that she was not in love with Hill, but that she continued to see him and to have sexual relations with him despite the great possibility that it would injure her family. We agree with the trial judge that her continued relationship with Hill must have been "calculated or deliberate, or both." There is nothing in the evidence to indicate that she would discontinue that relationship if she were awarded the custody of her children.
The conduct of Mr. Parker has also given us a great deal of concern. The fact that he regularly checked the speedometer of his wife's car and constantly harassed her about her telephone calls and whereabouts unquestionably made life unbearable for her and contributed toward making her "really not care." We find it inexcusable that he installed an extension telephone without her knowledge, which he used to listen in on and to tape her calls. By misrepresenting facts to her, he induced her to ride in his car to Hill's place of business, during the course of which ride he carried a loaded gun. Although Parker said he did not point it at defendant, the sheriff saw fit to advise Mrs. Parker to leave in order to avoid violence toward her by her husband. We are concerned about the action of Parker in spiriting the children away on the day he and his wife finally separated without giving Mrs. Parker an opportunity to see them, and his later conduct in having her arrested and placed in jail. We consider the conduct of Parker in these respects to be reprehensible, and in view of that conduct *686 we have serious doubts as to whether he is fit to have the custody of the children.
Under our established jurisprudence, however, the conclusions of the trial judge in custody cases are entitled to great weight, and the determinations made by him as to custody will not be set aside unless it clearly appears that there has been an abuse of discretion. In view of all of the evidence presented in this case, and despite our misgivings as to the fitness of Mrs. Parker, we have decided that the trial judge did not abuse the discretion vested in him in awarding custody to plaintiff. We thus will not disturb his judgment on that issue.
For the reasons assigned, the judgment appealed from is affirmed. The costs of this appeal are assessed to defendant-appellant.
Affirmed.
WATSON, J., dissents being of the opinion that the best interests and welfare of these young children would be served by placing their custody with the mother.