371 So.2d 769 (1979)
Godfred J. SCHEXNAYDER
v.
Sheila Granier SCHEXNAYDER.
No. 63550.
Supreme Court of Louisiana.
May 21, 1979.
Rehearing Denied June 25, 1979.[*]
*770 G. Walton Caire, Edgard, for plaintiff-applicant.
Harold J. Sonnier, Tauzin & Sonnier, Thibodaux, for defendant-respondent.
BLANCHE, Justice.
Godfred J. Schexnayder and Sheila Granier were married on June 20, 1970, in Kraemer, Louisiana, and subsequently established their matrimonial domicile in Vacherie, Louisiana. Of this marriage two children were born: Keith Paul and Holly Ann, ages five and three, respectively at the time this matter was tried.[1]
On January 14, 1977, Godfred Schexnayder, relator herein, filed a petition for separation from bed and board based upon the grounds of abandonment and requested custody of the two children. Respondent, Sheila Schexnayder, filed an answer generally denying the allegations of the petition and also sought custody of the two children. Relator subsequently filed a supplemental and amending petition seeking an immediate divorce on the grounds of adultery and again praying for custody pending the outcome of the proceedings.
On February 28, 1977, at the hearing on the issue of custody pendente lite, the trial judge awarded the custody of the minor children to the husband. The trial on the merits, held May 9, 1977, resulted in a judgment of divorce on the grounds of adultery in favor of Godfred Schexnayder. After taking the custody question under advisement, the trial court, on August 23, 1977, rendered judgment granting to the wife, respondent, the care and custody of the two minor children. The Fourth Circuit Court of Appeal, in a 3-2 decision, affirmed. 364 So.2d 1318 (La.1978). We granted writs to consider the correctness of the judgment below. 365 So.2d 1375 (1978).
The question presented is whether, under this Court's previous rulings, the trial judge erred in failing to find the respondent wife morally unfit to have custody of the minor children. The evidence regarding the adulterous affair was not seriously in dispute.
Sheila Schexnayder was twenty-three years old at the time this matter was tried. According to her parents, she quit school in the eighth grade because she was disinterested and making failing grades in all her subjects. The wife testified that she first met her paramour at a car wash in Vacherie, Louisiana, in September of 1976 while she was still living with her husband. About a week later he called her at her home and they began the illicit affair. Respondent stated that they went to a hotel in Napoleonville where they engaged in sexual relations. She claimed that she only met her lover about once a week and that the affair continued from September until her husband finally found out about it in early January. On cross-examination, respondent explained that she would leave the children with her mother-in-law, who lived next door to her and the relator, on the pretext of going to play bingo. There the grandmother would bathe and feed the children and put them to bed. On these occasions, she would meet her paramour behind a school, behind a church or other such places and then they would proceed either to the hotel in Napoleonville or another location and engage in sexual relations. One time she met him in front of Mike's Bar in Kraemer at noon on a Sunday. On this particular occasion, in full view of everyone in the area, she pulled up and parked her car, got out, walked across the parking lot and got into her lover's maroon van. From there, they went to the levee where she admitted that they had sexual relations in the van.
*771 Several witnesses testified that the actions of the respondent became the subject of much gossip throughout the small community and the surrounding area. The notoriety of the respondent's actions was no doubt accentuated by the fact that her lover was a member of another race. The town talk eventually found its way back to members of her own family. Respondent, however, was apparently oblivious to the impact her actions were having on the community. She testified she was unaware at the time that her activity was the subject of widespread gossip.
According to respondent's testimony at the trial for custody pendente lite, she was, however, aware of the impact the affair would have on her marriage and her children as the following reflects:[2]
"Q. So, therefore, each meeting was planned and every time you met him, you knew what was going to happen, is that right?
"A. Yes.
"Q. Now, when your parents found out, did you realize that if your family, your husband found out about this it would mean the end of your marriage?
"A. Yes.
"Q. Yes?
"A. Yes.
"Q. Did you realize at that time the effect it could have upon your children?
"A. No.
"Q. You didn't think about your children?
"A. I thought about them.
"Q. But, yet, you continued?
"A. Yes.
"Q. Did this situation become widely known throughout Kramer [sic], Vacherie and the local areas?
"A. Yes."
Respondent testified that she had discontinued the relationship and had not seen, nor attempted to see, her paramour since January 1, 1977, and that she did not wish to see him again. However, the strength of this testimony is called into serious question by evidence which established that she attempted to contact her paramour by telephone at his residence three times during the weekend of January 7, 1977. These calls caused her paramour's wife to confront the respondent and her parents at the latter's home. Other testimony established that respondent's parents found out in November, 1976, that she was having an affair and confronted her with it. She begged them not to tell her husband and promised them she would try to stop. The affair, however, continued. Respondent's sister-in-law also became aware of the affair about five days before Christmas, 1976. Between Christmas and New Year's, she confronted the respondent and the respondent again promised she would discontinue seeing her lover. She nevertheless continued seeing him. Respondent left her home on January 6 and moved in with her parents after her parents informed the relator that his wife was having an adulterous affair. It was the weekend after the respondent left her husband that she attempted to contact her lover at his residence by telephone. The evidence suggests that the respondent was either unable or unwilling to discontinue the relationship that was clearly against her own best interests and the best interests of her family.
While the testimony is in conflict, we think the preponderance of the evidence also established that the respondent generally neglected the legitimate needs of her husband and her children while engaged in the illicit affair with her paramour. Relator's mother, who lived next door to the couple, testified that beginning in September, respondent would bring the children to her home in their pajamas to spend the night and tell her that she (the respondent) was going out to play bingo. As the months went by, the practice became more and more frequent and respondent would simply send the children over with their *772 night clothes under their arms.[3] The grandmother testified that she took "pity" on them and would bathe and feed them, then put them to bed. The husband testified that in the fall of 1976 his wife seldom spoke to him at all, that meals were irregular and that often he would come home from work and find a note saying the children were at his mother's house and that his wife was playing bingo. The testimony also suggests that she refused to have sexual relations with him during this period. In addition, relator testified that respondent did not keep the house clean and that he did much of the housework himself.[4] Relator's mother testified that it took her and a maid eight days to clean the house after the respondent moved to her parents' home.
The trial judge, in his written reasons, clearly indicated he felt the case before him was indistinguishable from Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (La.1971):
"Here the husband obtained a divorce from the mother on the ground of adultery. The mother freely admitted an affair lasting from the end of September, 1976 to January 1, 1977, during which she met another man approximately once a week and with whom she admitted having intercourse approximately ten times. She denies having any contact with him since January 1, 1977, and there is no proof of any misconduct on her part since that date. No impropriety was shown to have been committed in the presence of the children.
"The question is, is this sufficient to deprive the mother of custody? The clear answer under the jurisprudence is no. Numerous cases have repeatedly held that a brief affair or isolated instances of adultery not shown to have been conducted in the presence of the children are insufficient to deny custody to a mother who is otherwise suitable.
. . .
". . . Accordingly the court is reluctantly compelled to the conclusion that the maternal preference rule requires an award of custody to the mother. . . ."
The Fourth Circuit Court of Appeal, in a divided opinion, affirmed, noting:
". . . In respect to her adultery, Mrs. Schexnayder is not a worse offender than Mrs. Fulco was. . . ." (364 So.2d at 1318)
This Court held in Fulco v. Fulco, supra, the following:
"(1) The paramount consideration in determining to whom custody should be granted is always the welfare of the children. [Citations omitted]"
"(2) The general rule is that it is in the best interest of the children of the marriage to grant custody to the mother, especially when they are of tender years. Such paramount right of the mother to custody should not be denied unless she is morally unfit or otherwise unsuitable, and it is only in exceptional cases that the better interest of the children is served by changing their custody from the mother to the father. [Citations omitted]" (254 So.2d at 605)
In regard to determining whether the wife is morally unfit or otherwise unsuitable, the jurisprudence of this state is to the effect that proof of one act of adultery or even of several acts with the same paramour, does not necessarily render morally unfit a mother who is otherwise suited for custody. Monsour v. Monsour, 347 So.2d 203 (La.1977); Messner v. Messner, 240 La. 252, 122 So.2d 90 (1960); Salley v. Salley, 238 La. 691, 116 So.2d 296 (1959); Parker v. Parker, 304 So.2d 681 (La.App. 3rd Cir. 1974), writ denied 307 So.2d 641 (La.1975); Strother v. Strother, 248 So.2d 867 (La.App. 3rd Cir. 1971).
However, when the mother has consistently engaged in a course of open and public adultery in defiance of generally accepted moral principles and in disregard of the embarrassment and injuries which *773 might be sustained by the children, then the court is justified in depriving her of the care of the children, and in awarding custody to the father or to some other party lawfully entitled to it. Monsour v. Monsour, supra; Salley v. Salley, supra; Kieffer v. Heriard, 221 La. 151, 58 So.2d 836 (1952); Beck v. Beck, 341 So.2d 580 (La.App. 2d Cir. 1977); Parker v. Parker, supra; Lambert v. Lambert, 286 So.2d 390 (La.App. 1st Cir. 1973); Johnson v. Johnson, 268 So.2d 114 (La.App. 3rd Cir. 1972); Strother v. Strother, supra; Tuggle v. Tuggle, 235 So.2d 166 (La.App. 2d Cir. 1970); West v. West, 170 So.2d 160 (La.App. 2d Cir. 1964); Brunt v. Brunt, 166 So.2d 71 (La.App. 3rd Cir. 1964); Morris v. Morris, 152 So.2d 291 (La.App. 1st Cir. 1963).
The purpose of the above jurisprudentially established rule is not to punish the mother but to protect the children. We recognize that in many cases infrequent indiscretions may be born out of human frailty rather than an absence of moral character. In such cases, the adulterous affair will not mitigate against a person's claim for custody. However, in cases where a person consistently and over a period of time engages in a course of open and public adultery in defiance of generally accepted moral principles in total disregard of any embarrassment and injuries which might be sustained by the children of the marriage, past misconduct forms an important consideration in determining the present suitability of a parent. Beck v. Beck, supra; Monsour v. Monsour, supra; Borras v. Falgoust, 285 So.2d 583 (La.App. 4th Cir. 1973). We believe this because common knowledge and experience teaches that a child learns by example, especially from his parents, Beck v. Beck, supra, and that it is a parent's duty to demonstrate to his or her children qualities of good moral character. Consequently, parents fail in that duty when they openly and notoriously display an utter disregard for moral and social values in the area of sexual fidelity toward each other and thus forfeit the moral leadership owed their children.
Upon appellate review, the determination of the trial judge in child custody cases is entitled to great weight and will not be disturbed unless a clear showing of abuse of discretion is made. Fulco v. Fulco, supra, and cases cited therein. However, a reading of the trial court's reasons for judgment clearly indicates that the sole reason custody was granted to the respondent was that the trial judge felt our decision in Fulco v. Fulco compelled that result. We disagree.
While this Court today reaffirms the principles set down in Fulco, we believe that case to be distinguishable from the case at bar for three reasons.
First, the adulterous affair in Fulco occurred during the period after the couple had already obtained a judicial separation. While we recognized that the obligation of fidelity still exists during this period, we held:
". . . A judicially separated wife is not required to live in monastic seclusion, without any male acquaintances (although of course if she engages in a calculated and continued public course of misconduct, such will be regarded as detrimental to the interest and welfare of her children)." (Fulco v. Fulco, 259 La. 1122, 254 So.2d at 605)
In the instant case, the parties were still married and living together when the wife engaged in her extramarital affair.
Second, in Fulco, the wife had been awarded custody pendente lite. The adverse impact upon the children by a change in custody from one parent to the other was seen as an important consideration in the overall determination of the best interest of the children. This was an element in favor of the mother in Fulco. In the instant case, however, the father had been granted temporary custody and the children had continued to live with him in the former matrimonial domicile as they did before the separation.[5] Hence, the determination of custody pendente lite in this case acted to disfavor the wife.
*774 Third, the majority opinion in Fulco does not suggest that the affair of the wife was as open and notorious as the respondent's activity in the instant case. In the case at bar, the parties lived in a small, rural community. The evidence shows that the actions of the respondent were so open and notorious that the affair was the subject of widespread gossip in the towns of Vacherie and Kraemer and the surrounding areas. Further, respondent flaunted her indiscretions in public knowing the impact it would have on her marriage and clearly in disregard of any detrimental effect it could have on her children.
We acknowledge that the evidence indicates that the respondent did not engage in any sexual activity with her paramour in front of the children. While the existence of such conduct would certainly be relevant in our determination here, the lack of its occurrence does not end our inquiry. We believe that the flagrant disregard for established moral principles demonstrated by the respondent, her insensitivity to any embarrassment or injuries her conduct might inflict on her family, and her willingness to abandon motherly and wifely responsibilities in order to pursue extramarital sexual activities all combine to demonstrate that the respondent is "morally unfit or otherwise unsuitable" to have custody of the children.
The record indicates that if custody were to be given to the husband, the children would stay with the relator's mother who would care for the children while the relator is at work. The grandmother lives with her husband in a three-bedroom home in Vacherie. She testified that she would be willing and able to help care for the children indefinitely. We are satisfied that the relator will be able to provide a healthy, stable environment in which to rear the children.
We, therefore, conclude that the trial judge erred in removing custody from the husband and awarding it to the wife based upon our ruling in Fulco.

DECREE
The judgment of the trial court is reversed and the provisional care, custody and control of the two minor children, Keith Paul Schexnayder and Holly Ann Schexnayder, is hereby vested in the father, Godfred J. Schexnayder. All costs are assessed to respondent.
REVERSED AND RENDERED.
TATE and DENNIS, JJ., dissent and assign reasons.
TATE, Justice, dissenting.
I respectfully dissent.
Both the trial court and the intermediate court faced up squarely to the dilemma posed by this custody dispute: Should a mother, who had otherwise been a good parent (except possibly during a brief love affair) and who would normally be awarded custody, be deprived of the custody of her children (aged 5 and 6) because, in a period extending over three months, she had engaged in a love affair and had committed adultery approximately ten times away from her home?
If, as the majority suggests, the affair had been so notorious and flagrant and long-continued, the trial and intermediate courts would not have awarded the mother custody. Nor would they have done so, if she had not been a good mother over the years, as shown by the record.
Here, we must remember, the tempestuous and justly condemned brief affair, was terminated by January 1, 1977, some 17 months ago. Since then, the mother has completely returned to her normal good character. The children have been with her following the trial court's award of custody well over a year ago.
The effect of our judgment is to tear these young children from their mother's custody, by whom they have been cared for since birth, because of our moral outrage at her conduct during her brief affair. However, the award of custody should be determined by the best welfare of the children, not to punish a mother for past misconduct after her reform.
*775 I therefore would not disturb the judgment of the trial court, affirmed by the intermediate court, that under all of the circumstances the best interest of these young children is served by leaving them with their mother in accordance with the trial court's determination.
DENNIS, Justice, dissenting.
I respectfully dissent.
On the reasonable factual findings by the trial judge and the court of appeal, there is no valid distinction between this case and Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971). The only significant factual distinction was noted, but courageously and correctly rejected, by the trial judge who stated:
"However the mother's conduct was particularly scandalous and offensive to the sensibilities of the local community in that her lover was of another race. The court has for this reason long delayed its decision. Our laws against miscegenation have been ruled unconstitutional and insofar as the law is concerned the question of race is irrelevant. Accordingly, the court is reluctantly compelled to the conclusion that the maternal preference rule requires an award of custody to the mother. However, the court will make such custody provisional and subject to the mother's continued good conduct."
The majority opinion, which is based upon extensive redetermination of close issues of fact by the trial and intermediate appellate courts, will, I fear, be read as either effectively overruling Fulco v. Fulco, supra, or allowing child custody awards to be made on grounds which deny the equal protection of the laws.
NOTES
[*] Tate and Dennis, JJ., would grant a rehearing.
[1] Keith Paul was born on June 4, 1971, and Holly Ann on June 21, 1973. Hence, the children at the date of the hearing on May 9, 1977, were actually almost six and four, respectively.
[2] At the trial on the merits, she claimed she did not know it would end her marriage, but this Court is inclined to discount this subsequent disclaimer.
[3] The houses were only thirty or forty feet apart.
[4] Testimony established that the respondent was not employed and had no other responsibilities other than the household duties.
[5] Testimony indicated relator's mother keeps the children while he is at work.