427 So.2d 1278 (1983)
Richard G. MURPHY, Plaintiff-Appellee,
v.
Patricia F. MURPHY, Defendant-Appellant.
No. 15180-CA.
Court of Appeal of Louisiana, Second Circuit.
February 22, 1983.
Francis M. Gowen, Jr., Shreveport, for defendant-appellant.
Barry E. Edwards, Shreveport, for plaintiff-appellee.
Before HALL, FRED W. JONES, Jr. and SEXTON, JJ.
HALL, Judge.
The wife-mother appeals from a judgment of the district court rendered after trial of rules to show cause ancillary to a separation proceeding awarding "temporary" *1279 custody of the two minor children of the marriage to the husband-father. For the reasons expressed in this opinion, we affirm the judgment of the district court.
On March 30, 1982 Richard G. Murphy filed a petition seeking a separation on the grounds of cruel treatment. Alleging that the children, a daughter eight years old and a son seven years old, were living with him at the home of his parents, petitioner prayed for an ex parte order granting him provisional custody of the children and that a rule issue ordering Mrs. Murphy to show cause why he should not be granted custody of the children during the pendency of the separation proceeding. An ex parte order granting provisional custody was signed by a district judge and a rule issued. Mrs. Murphy filed an answer generally denying the allegations of plaintiff's petition, and a reconventional demand for a separation on the grounds of abandonment and for custody of the children during the pendency of the litigation, pursuant to which a rule was issued ordering Mr. Murphy to show cause why pendente lite custody should not be granted to Mrs. Murphy.
Trial of the rules commenced on April 8 and was concluded on May 6 after six days of testimony. For reasons orally stated, judgment was rendered awarding Mr. Murphy the "temporary" care, custody, and control of the children pursuant to LSA-C.C. Art. 146, subject to reasonable rights of visitation granted to Mrs. Murphy. From a judgment signed on May 17 Mrs. Murphy appealed.
In the normal course of the appellate process, the appeal was submitted for decision in this court on January 17, 1983 and the opinion of this court is scheduled to be handed down on February 22, one month short of a year since the litigation commenced.

Background Facts
Mr. and Mrs. Murphy were married in 1971. Until their separation they lived in a home in the Southern Hills area of Shreveport. Mr. Murphy is a railroad brakeman and has been the breadwinner for the family, earning in excess of $20,000 per year. His job has required him to work out of town frequently over the years, and for a considerable period of time prior to the separation he worked the night shift, leaving home about 7:00 in the evening and working until late at night or early in the morning. His working hours require that he sleep during the day.
After the children were born Mrs. Murphy assumed the role of housewife and homemaker with primary responsibility for taking care of the children. She did the usual household tasks, cooking, cleaning, washing, and the like. Additionally, she did the things that mothers ordinarily do in raising children, teaching them to ride bikes and to skate, taking them horseback riding and to play putt-putt, taking the daughter to dancing lessons and participating with her as a Brownie leader, organizing neighborhood games, attending school carnivals, taking the children to the doctor and dentist, and taking the children to Sunday School on a fairly regular basis.
Likewise, Mr. Murphy did the things a working father ordinarily does with his children, going on family vacations in the summertime, helping his daughter with her math homework in the afternoons, taking his son fishing, and the like.
The Murphys had close relationships with other members of their family. For many years the children spent at least two weekends a month with Mr. Murphy's parents who live in the Cedar Grove neighborhood which is also in the southern part of Shreveport. Mrs. Murphy's parents live close by in Southern Hills and Mrs. Murphy and her children frequently visited there. Mrs. Murphy and her husband's sister were best friends.
In November 1981, Mrs. Murphy, who had driven a school bus as a substitute driver, took on a regular route. She worked from 6:30 to 9:00 in the morning and from 1:30 to 4:00 in the afternoon. Mr. Murphy started preparing the children's breakfast and getting them off to school.
There is nothing in the extensive testimony in this case to indicate that, up until a *1280 few months or a year prior to the separation, the Murphys were anything other than good parents leading a fairly typical life and meeting their respective responsibilities to their family and children.
The testimony at trial of the custody rules centered primarily on the home situation over the several months preceding the separation, and particularly on Mrs. Murphy's actions and conduct during this time. Testifying for the father were his sister, the eight-year-old daughter, his mother, his father, and his sister's husband. Testifying for Mrs. Murphy were two or three friends and neighbors, a neighbor's daughter who babysat for her, her two sisters, and her mother and father. The potential for bias among the witnesses for both sides was high and evident. Mr. Murphy and his witnesses attempted to portray Mrs. Murphy as an incompetent housekeeper who did not properly attend to cleaning the house or cooking, and as being away from home too often at night while Mr. Murphy was working. Mrs. Murphy and her witnesses attempted to portray Mr. Murphy as an overly-strict disciplinarian and as spending very little time with his children because of his work  sleep schedule and because of his hunting and fishing activities.
The essential theme upon which most of the testimony centered, as well as that which the trial court found as pivotal in making its determination, concerns the frequenting of local taverns by Mrs. Murphy with both men and women friends in the year or so immediately preceding this suit for separation. There was considerable conflict in the testimony as to the frequency of her attendance at lounges, and the frequency of out-of-town trips Mrs. Murphy made to Houston to visit a lady friend there.
It is clear from the evidence, particularly Mrs. Murphy's own testimony, that she had become disenchanted with her marriage and felt she was in a rut. She began going on a frequent basis at night after the children went to bed, to a lounge known as John Henry's, leaving the children with a babysitter, usually the girl who lived next door, or leaving the children with the grandparents on the weekend. The frequency of her going out is not clearly established by the evidence but it probably was as often as three or four nights a week. Sometimes Mrs. Murphy would come home at 9:00 or 10:00 at night and sometimes it was later. While at the lounge she would visit with friends, both male and female, and on one occasion shortly prior to the separation Mr. Murphy went to the lounge and saw Mrs. Murphy sitting on the lap of and hugging a male friend.
Mrs. Murphy's explanation of this conduct was that she felt in a rut and that she wanted to be with some people who smiled for a change. She testified that although this may not have been ladylike she did not see anything wrong with it. She also testified, however, that she had not been to the lounge since the legal proceedings were started and that if given custody of the children she would not go back. She denied that there was ever any sexual misconduct with any of the men she met or visited with at the lounge and there is no evidence in this record to support any finding of sexual affairs or misconduct on her part. However, even Mrs. Murphy's witnesses testified that they considered the described activities of Mrs. Murphy, of which they were unaware, improper.
After Mr. Murphy learned of this conduct on the part of his wife and after he apparently listened to some tape recordings of some of her telephone conversations with friends, he took the children and moved in with his parents, and filed suit for separation and custody.

Trial Court Action
In oral reasons for judgment stated at the conclusion of the trial the court noted the difficulty of deciding custody cases. The court noted that there is no longer a preference or presumption in favor of the mother and that the sole basis for determining custody is the best interest of the children. The court made the following findings:
"The Court believes that the issue here is one of stability. The Court looks to the *1281 stability of the parent to determine which parent should be awarded the custody of the children. The Court recognizes the real-life fact, based on human experiences, based on most experiences, that the mother is primarily responsible for the care of the children. However, in this case the primary issue is whether this mother's conduct is of such a nature as to reflect a basic instability to properly care for the children. Therefore, the issue is simply one of stability.
"The Court considers a number of factors as it has reviewed the testimony of this case, and will state the factors that weigh heavily in the Court's mind. The mother's own testimony is probably the most damaging of all, to the Court. In her testimony, Mrs. Murphy confirmed that she, in the last 12 months or 14 months, felt that she was  and I think this phrase was used from the testimony of other people  but it was confirmed that she was `in a rut' and wanted to get out of the routine of her married life that she had had for the last ten years or so. Testimony is clear that Mrs. Murphy began approximately 12 or 14 months ago to frequent local taverns and bars which was a change from what she had done before. These events appeared to increase during the time and culminated in the events of January, February and March of 1982.
"It is clear from that testimony that Mrs. Murphy would go to these bars several times a week and associate with men friends there, as well as her lady friends. On March 5 of this year she was caught by her husband sitting in the lap of a man, hugging him. This conduct was the basis  or one of the bases  for the suit for separation. The conduct alone would not be the grounds, in and of itself, to give the children to the father. However, there are other factors which reflect a detrimental effect on the children as a result of Mrs. Murphy's continuing conduct. The testimony is clear that shortly after her husband would leave for work, around 7:00 P.M., Mrs. Murphy would get a babysitter several times a week for the children and then go out to bars and taverns to meet her friends. As things progressed, men would call home and as testified in Court, at least one of the children would answer the phone. One of the children, Elizabeth, testified that she did answer the phone and talked to her mother about her mother's men friends. There was a conversation between Elizabeth and her mother about Mrs. Murphy's boyfriends.
"In summary, it is the Court's feeling that Mrs. Murphy is experiencing a type of mid-life crises that we see so often now, in which she is reevaluating her own needs and own lifestyle. In doing so, she is placing her own personal needs over that of her children and therefore, has neglected her duties as a mother to these children. The Court believes this conduct marks a type of instability in Mrs. Murphy which could be harmful to her children if she was given the permanent custody of them at this time.
"On the other hand, the father presents a more stable picture to the Court. The only criticism appears to be that he swears a lot and that he is a strict disciplinarian. There is no testimony, however, that the children have been adversely affected by his actions. In addition, Mr. Murphy has been assisted in the caring for the children by his parents, who according to all testimony presented in Court by both sides, are well-respected and trusted in the care of the children. It is therefore the Court's opinion that in the best interest of the children custody should be granted to the father until such time as Mrs. Murphy can demonstrate a more stable character. The Court is guided in its determination by the following cases: THORNTON VS. THORNTON, 377 SO. 2ND 419 [417]; NALE VS. NALE, 400 [409] SO. 2ND 1299; and JAMES VS. JAMES, 400 [409] SO. 2ND at 1297." (Emphasis supplied).

Specifications of Error
The appellant specifies that the court erred in its best interest determination, contending that the court ignored factors favoring the mother such as the facts that she was the parent who had primarily cared for the children and who had a close bond with them, and that stability of environment would be served by leaving the children *1282 with her in their home. Appellant further argues that an award of custody should not be used as a tool to regulate human behavior.
Appellant also specifies as error the court's allowing Mr. Murphy to refuse on the basis of the Fifth Amendment to answer questions about having taped Mrs. Murphy's telephone conversations.

Appellate Review of a Custody Judgment
A discussion of the function and role of an appellate court in reviewing custody judgments, and particularly provisional custody judgments, is in order.
In Bordelon v. Bordelon, 390 So.2d 1325 (La.1980) the Supreme Court held:
"This Court has clearly stated that in child custody cases, the procedure for appellate review is to give great weight to the determination of the trial judge, and to overturn a determination only when there is a clear abuse of discretion. Fulco [v. Fulco, 259 La. 1122, 254 So.2d 603 (1971)]; Cleeton v. Cleeton, 383 So.2d 1231 (La.1980). This test is substantially similar to the rule applied by the appellate court, which prevents the upsetting of a trial court determination of fact unless it is `clearly wrong'. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979). Under these rules, a conclusion reached by a trial court derived from the facts is entitled to just as much weight as a conclusion that certain evidence establishes a fact ...."
In a later case, Bagents v. Bagents, 419 So.2d 460 (La.1982), the court held:
"The principal consideration in every child custody case is the best interest and welfare of the child ...
"In performing its function of deciding custody cases, the trial court is vested with a vast amount of discretion. On appellate review, great deference must be accorded to the decision of the trial court, not only because of that court's better capacity to evaluate witnesses, but also because of the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
"The decision reached by the trial court in this case is not necessarily the decision that the individual judges of this court would have reached. Nevertheless, this court's function is not to substitute its collective decision for that of the trial court, but to review the decision for error of law. We cannot say in this case that the trial court erred as a matter of law in deciding that a change of custody was in the child's best interest." (Emphasis supplied).
In a very recent decision of this court, Tabor v. Tabor, 421 So.2d 1185 (La.App.2d Cir.1982), we held:
"In civil appeals, our review extends to facts and law. LSA Constn. Art. 6, § 10(B). We recognize the difficulty and futility of attempts to reconcile the many reported opinions in child custody disputes. Appellate courts cannot and do not lay down hard and fast rules and guidelines in these cases and counsel should not take a factor or legal principle from one case and assert that factor or principle as controlling in another case because each case deals with a peculiar parental relationship which will exist prospectively, and then only as long as the circumstances in the relationship do not change in the future. The only common features in these cases are the principles that each case must be determined on its own facts, that the trial courts shall make the determination on the best interest of the child, and that, in the absence of a showing of a clear abuse of discretion, the appellate court will uphold the trial court's judgment. Bagents, supra. See and compare Nale v. Nale, 409 So.2d 1299 (La.App.2d Cir.1982) and James v. James, 409 So.2d 1297 (La.App.2d Cir.1982). In all cases, the appeal is from the judgment, and not from the trial court's reasons for the judgment. CCP Arts. 2082-2083; State, in Interest of Mason, 356 So.2d 530 (La.App. 1st Cir.1977)."
The instant case must be viewed in the context of its present posture on appeal. Within a month or so after the separation *1283 suit was filed, with competing claims for provisional custody of the children during the pendency of the litigation, the trial court was required to determine, pursuant to the provisions of LSA-C.C. Art. 146, to whom custody should be awarded in accordance with the best interest of the children. Exercising its sound discretion, considering what it perceived to be some instability on the part of the mother which had affected her attention to her home and children and considering the stability of the situation in which the children were then living with their father in the home of their grandparents, the trial court decided to maintain that situation by awarding temporary custody to the father.
Some nine months later this court is faced with reviewing the trial court's action, with any decision this court renders to become definitive about a year after the trial court judgment was rendered. Our review is on a record of evidence taken almost a year ago, and, of course, we have no information as to what has since transpired. Presumably, the separation and divorce litigation has proceeded and is nearing an end. Presumably, the case is nearing the point where the issue of permanent custody under LSA-C.C. Art. 157 will be presented to the court and decided. While this appeal was pending, Articles 146 and 157 were amended, particularly to provide for joint custody as the preferred result. Permanent custody in this case will be governed by the provisions of the amended Article 157.
The trial court's decision in any custody case is entitled to great weight and should not be disturbed in the absence of a clear abuse of discretion. This principle applies particularly and especially where the decision being reviewed is an award of temporary, provisional custody pending litigation, where the decision seems to have been grounded on particular circumstances existing at the time of the separation of the parties which may have been temporary in nature, and where appellate review is not had until almost a year later at a time when determination of permanent custody appears to be near at hand.

Best Interest Determination
It is clear from the evidence that from the time of the children's birth the primary responsibility for the care of the children was with the mother and that until the recent months preceding the separation this responsibility had been adequately met by her. The principle or factor that it is usually in the best interest of small children that their custody be granted to the parent who has primarily furnished nurturing care to the children and who has a close bond with the children, favors granting custody to the mother in this case. See Nale v. Nale, 409 So.2d 1299 (La.App.2d Cir.1982). At the time the provisional custody rules were tried the principle or factor of stability of environment favored granting custody to the mother so that the children would continue to live in the home in which they had lived all of their lives and in the neighborhood with which they were familiar. Bankston v. Bankston, 355 So.2d 58 (La. App.2d Cir.1978), writ denied 357 So.2d 1153 (La.1978). The only factor weighing against granting custody to the mother, and this is an important factor which the trial court considered determinative, was some degree of instability evidenced by her actions in the recent months preceding the separation in going out frequently at night, leaving the children with babysitters, resulting in her neglecting to some extent her family, home, and child-raising responsibilities. Schexnayder v. Schexnayder, 371 So.2d 769 (La.1979); Manley v. Manley, 389 So.2d 454 (La.App.2d Cir.1980).
Viewing this case in the context of the proper function and scope of appellate review of a provisional temporary custody judgment, we find no clear abuse of the trial court's discretion in making a temporary, provisional award of custody to the father, pending the litigation. Given the facts as they existed when the rules were tried shortly after the parties separated, there was a reasonable basis for the trial court's determination that it was in the best interest of the children to leave them in the *1284 custody of the father, living with the paternal grandparents, while the separation suit was pending and until the mother demonstrated greater stability.

Fifth Amendment Issue
It was apparent from questions posed to Mrs. Murphy on cross-examination and from other references in the testimony to tapes that Mr. Murphy had tape recordings of some of Mrs. Murphy's telephone conversations. When Mr. Murphy was asked about the tapes on cross-examination, he refused to answer on the grounds that his answer might be incriminating, and his refusal to answer was upheld by the trial court.
Appellant contends she was denied the right to full cross-examination and that if Mr. Murphy criminally recorded some of her conversations it reflects on his moral character.
We dispose of this specification of error by stating that the matter is entirely insignificant to the resolution of the primary issue of best interest and custody.
For the reasons expressed, the judgment of the district court is affirmed.
Affirmed.