430 So.2d 189 (1983)
Cynthia Denise Cassell STEWART, Plaintiff-Appellant,
v.
Norman Dale STEWART, Defendant-Appellee.
No. 15292-CA.
Court of Appeal of Louisiana, Second Circuit.
March 28, 1983.
Fayard & Snell by A.R. Snell, Bossier City, for plaintiff-appellant.
Love, Rigby, Dehan, Love & McDaniel by Samuel P. Love, Jr., Shreveport, for defendant-appellee.
Before PRICE, HALL and NORRIS, JJ.
HALL, Judge.
Appellant, Cynthia Stewart Gonzales, appeals a judgment of the district court awarding a change of custody of the two daughters, ages three and four, born of the former marriage between appellant and appellee, Norman Dale Stewart, from the appellant to the appellee. For the reasons expressed in this opinion, we reverse the judgment of the district court, and render judgment rejecting appellee's petition for a change of custody, and reinstate the previous judgment of the district court granting custody to the appellant.
The Stewarts were married on April 22, 1977 and two children were born of this marriage, Shannon Denise born on December 20, 1977, and Melisa Nicole born on February 10, 1979. The parties developed marital difficulties in early 1980 and separated in February of that year. They later reconciled but in December 1980 the parties separated again. Mrs. Stewart filed a petition for separation on the grounds of constructive abandonment and cruel treatment, and asked for custody pendente lite of the two girls. Mr. Stewart answered, denying Mrs. Stewart's allegations and reconvening for separation on the grounds of her abandoning him. Mr. Stewart also asked for custody pendente lite of the children. A judgment in Mrs. Stewart's favor in the separation action was signed on March 10, *190 1981, awarding Mrs. Stewart the custody pendente lite of the minor children and ordering Mr. Stewart to pay her $250 monthly child support.
Between February and March 1981 Mr. and Mrs. Stewart met and began dating other people. Mrs. Stewart was keeping steady company with Dale Gonzales, while Mr. Stewart was regularly seeing Debbie Nix. In August 1981 Mr. Stewart filed a petition for an absolute divorce on the grounds of adultery. Mrs. Stewart answered, denying the allegations of Mr. Stewart's petition and reconvening for an absolute divorce on the grounds of Mr. Stewart's alleged adultery with Ms. Nix, who was alleged to be pregnant with Mr. Stewart's child. Mrs. Stewart additionally alleged in her petition that Mr. Stewart was $850 in arrears in his child support obligation. Trial was held on these issues and a judgment was rendered on November 5, 1981 granting Mrs. Stewart the divorce, permanent custody of the children, and permanent child support in the amount of $250 per month. Although the divorce was granted to Mrs. Stewart, testimony at the later change of custody hearing makes it clear that it was established at the divorce trial that both parties had been guilty of adultery. The trial court found both parties at fault, thereby precluding either party from seeking permanent alimony. In addition, the trial court made executory child support arrearages of $450. Judgment was signed on November 24, 1981.
The day after the divorce judgment was rendered Mrs. Stewart left Louisiana with the children for California where she started living with Dale Gonzales, an Air Force sergeant who had been transferred to California. On November 28, 1981, a few days after the divorce judgment was signed, Mr. Stewart married Debbie Nix to whom his child had been born about a month previously.
On June 17, 1982 Mr. Stewart and the second Mrs. Stewart flew to California to get the children for their two-month summer visitation. When they returned to Louisiana Mr. Stewart, on June 23, 1982, filed the rule to change custody which forms the basis of the instant controversy. Mr. Stewart alleged that a change in custody was warranted because the former Mrs. Stewart was living in open concubinage with Gonzales and therefore exposing the two young children to an illicit sexual relationship to the children's detriment. Alternatively, in the event a change in custody was denied, Mr. Stewart prayed for a change in his visitation privileges.
On August 12, 1982 trial was had on the rule to change custody. Cynthia Stewart Gonzales testified that she and Dale Gonzales had lived together with the children in a three-bedroom house trailer from the time she went to California. They were married on July 18, 1982, after the rule to change custody was filed. She testified that it was always their intention to get married and that they would have been married sooner had Gonzales not had trouble obtaining a divorce from his former wife. It was established that Gonzales separated from his former wife on March 29, 1981 and that the former Mrs. Gonzales filed a petition for divorce on the grounds of having lived separate and apart for one year in early June 1982, prior to the time the rule for change in custody was filed. The Gonzales divorce was rendered in early July 1982.
Mrs. Gonzales testified that she has a high school GED diploma and that she is currently unemployed although she has tried to find employment. She testified further that the two children were never exposed to any illicit sexual activity and that she and Gonzales had sexual relations only at night when the children were asleep. She acknowledged that living with Gonzales without being married to him was wrong but explained that she loved him, did not want to lose him, that he was good for her and the children, and, as previously mentioned, that they had intended all along to be married as soon as he was divorced from his former wife. Mrs. Gonzales testified that she felt that she was adequately providing for the children's needs and that they were healthy and happy. They do not attend church with the children.
*191 The testimony of several witnesses who appeared both for the appellant and the appellee, including the testimony of Mr. Stewart, corroborated the appellant's testimony concerning her fitness as a parent. She was categorized as an excellent housekeeper and a good cook who dressed and fed the children well. All of the witnesses testified that the appellant had always cared well for the children. There was testimony that Mr. Gonzales was a "nice guy" who is good and attentive with the children. He did not testify at the trial because he was unable to get away from his duties with the Air Force.
Mr. Stewart and his present wife testified in his behalf. Mr. Stewart is a carpenter and cabinet maker, regularly employed, with a net weekly pay of between $200 and $250. Mr. and Mrs. Stewart live in a two-bedroom house trailer with their daughter who was nearly 10 months old at the time of the trial. The present Mrs. Stewart is a housewife who cares for the Stewart children and is willing and able to take care of them. Her ability to care for the children was corroborated by a witness for whom she used to babysit and who testified that she is a responsible individual who is adept at caring for small children. The Stewarts do not attend church regularly.
The Stewarts testified that Mr. Stewart was seeking a change in custody because they believe that appellant is unfit to care for the children because of her living with Mr. Gonzales without being married to him which they felt had and would have a detrimental effect on the children. They also testified that they were seeking a change in custody because it was unfair to him for Mrs. Gonzales to have custody, with its attendant difficulties of visitation and communication with the children.
The evidence establishes that Mr. Stewart was derelict in discharging his child support obligation between the time the separation judgment was rendered and the time of the trial of the child custody rule. A record of Mr. Stewart's monthly child support payments introduced into evidence shows that Mr. Stewart rarely, if ever, sent his former wife all of the $250 monthly sum which he was obligated by court order to pay, and there is also evidence that he missed several payments entirely. Mrs. Stewart was forced to enlist the help of the California Welfare Department and to file a garnishment proceeding against Mr. Stewart's employer in Louisiana in order to collect child support. Mr. Stewart attempted to justify his failure to pay by stating that he was laid off during some of the period in question, which was verified by appellant, and because appellant would not tell him where they were living and would not allow him to talk to his children on the telephone for a time.
The fact that Mr. Stewart is a good father and loves and is loved by his children, was corroborated by all of the witnesses who know him, including appellant.
On the basis of this evidence the trial court granted Mr. Stewart's request for a change in custody. The oral reasons for judgment rendered at the conclusion of the trial by the learned and conscientious trial judge recite in part:
"... Now, both parties, as far as morality is concerned, both parties have been guilty of adultery.... The evidence shows that when the children are with Mr. Stewart, that he has adequately cared for the children and has a good relationship with them. And also apparently Debbie, his present wife, has a ... good relationship with the children according to the witnesses who testified. Evidence also shows that while the children have been with Mrs. Stewart that she has cared for them adequately. The children seem to be well-mannered, well fed, well clothed, well cared for. Basically, about the only testimony we have as to Mr. Gonzales' relationship with the children comes from a now Mrs. Gonzales. But she testified that he had a good relationship with the children as well. I believe there was another witness who testified that they had seen the children with Mr. Gonzales, and that observed a good loving relationship there, also .... the fact situation basically is that the *192 cause for the change of custody primarily is because Mrs. Stewart lived in an adulterous relationship with Mr. Gonzales from about November the sixth of eighty-one up until July the eighteenth of eighty-two when they married. Now, there are many cases dealing with this. In this particular case, Mrs. Stewart said that they intended to get married from the outset, that they couldn't do so because they had some difficultyMr. Gonzales had some difficulty getting a divorce because he was out of state.... Mrs. Gonzales filed for a divorce June four eightyeighty-two, and she was awarded their divorce on June seven of eighty-two in Caddo Parish.... But this rule was filed June the twenty-third of eighty-two. The parties at the time this rule was filed were living together and not married.... Now thethe adulterous relationship withwas what I would classify as aa concubinage relationship, that is the parties lived together openly as husband and wife.... And as I said ... there are many cases dealing with this subject matter.... For example Cleeton versus Cleeton was a case that went to the Louisiana Supreme Court. And in that Cleeton case, the custody ultimately ended up with the mother.... In that particular case, the Court found that the Cleetons ... while they had had an adulterous relationship that was ... a ... discrete type of relationship, that is they stayed together overnight but only after the children were asleep and that sort of thing. So it was kept from the children. Now, it was pointed out that the children were accustomed to the mother's care, and that they were well cared for .... you have that factor here. But one difference in this case and the Cleeton case ... is this case very clearly a concubinage type of thing, very open relationship, a permanent ... type relationship. And it was certainly a cohabitation.... Mrs. Stewart, while admitting to the relationship between the parties, testified that she basically knew that it was wrong for her to be living with Mr. Gonzales in the adulterous relationship, but she said that she knew it was wrong but that she couldn't wait. She loved him, and she wanted to be with him. And she said that the children comes first to her. At first she said she didn't know that it might cause her to lose the children. Then she admitted that she had thought about it, and that she knew ... that her former husband would file for custody asking for those children and that she was waiting for the day that he was going to file that custody rule ... but that ... she knew in her mind that she was planning on getting married. The point is as has been pointed out in other cases, she has lived ... in recent, open, and public adultery with her paramour for a substantial period of time in total disregard of the moral principles of society. And I find that it was a willful disregard of those moral principles. She had some other alternatives to hershe could have not lived with Mr. Gonzales until after he got his divorce, or she could have seen that the children were not present in that environment if she chose to live with him and could not resist that temptation. And I find because of that open relationship and because of what appears to the Court to be a willful disregard of the moral principles of society, that and also because the Courts have found in other cases that the adultery of a mother especially or really of either party I would think at this point under the present law, the adultery of the mother especially when it's open and public for a substantial period of time in total disregard of the moral principles of society has repeatedly been held to establish that the mother is morally unfit to maintain custody of her children. And, of course, the test that is now placed upon us by Article 157 is what is in the best interest of the children. And we have two small girls here. That has to be taken into consideration, too. And I'm concerned not so much about the parents or their views, but about ... the children and their best interest. But because of this relationship that I have described and found, I feel that under the circumstances *193 because of the mother's flagrant disregard of the moral principles of society, it'd be in the best interest of these children that they live with their father at this point in their lives. And I'm going to award the custody to Mr. Stewart."
From the reasons expressed by the trial court it can be seen that the court found that the children had been adequately cared for by their mother and would be adequately cared for by their father if custody were to be granted to him. The sole reason expressed by the trial court for granting the change of custody was his finding of moral unfitness on the part of the mother arising out of her living, with the children, in open concubinage with a man who was not her husband during the period of approximately eight and one-half months from the time the parties were divorced until her marriage to the man after the rule for change of custody was filed.
Under the facts and circumstances of this particular case we are of the opinion that the trial court abused its discretion in making the best interest determination in favor of custody by the father on the basis of the one, albeit important, factor which weighed against custody by the mother, without giving appropriate and proper weight to other important factors which favored custody by the mother.
Some of the important factors weighing in favor of continued custody by the mother and against a change in custody are: (1) the mother has been the young girls' primary nurturing parent since their birth and had continued in this role after the parties' separation and divorce to the time the children were taken to Louisiana for summer visitation shortly before trial of the change of custody rule; (2) the children were well cared for by the mother and the man with whom she was living and whom she later married and the children were healthy, well mannered, and happy in the environment of living with their mother for the approximately one and one-half years since their parents separated; (3) it is generally in the best interest of small children not to change the environment in which they have been living and seem to be well cared for and happy, absent compelling reasons to do so; (4) it is generally in the best interest of small children, especially small girls, that their custody be entrusted to their mother who has been the primary nurturing parent and with whom the children have a close bond; (5) the father had himself been guilty of moral indiscretions which could be said to cast doubt on his moral fitness as a parent, although certainly the mother's moral indiscretions were greater due to the more direct exposure of the children to her conduct; (6) although the mother's moral misconduct could have, if continued, had a detrimental effect on the children as they grew older, the evidence is that at their tender ages of three and four the misconduct has not to this time had any detrimental effect on them, and the moral misconduct has been discontinued; and (7) the father had to some extent failed to comply with his financial responsibilities to the children by failing to pay the full child support ordered by the court in a timely fashion.
Both parties were guilty of moral indiscretions, Mr. Stewart in fathering a child out of wedlock while still legally married to another woman, and Mrs. Gonzales by living, together with her children, with a man to whom she was not married. This page in the history of their lives, written at the time their marriage had broken up and during the period of readjustment, has now been turned over and is behind them. In our view, the past misconduct of the parties does not support a finding that either parent is presently morally unfit to raise the children. To the contrary, the evidence supports a finding that both are good parents and capable of providing good homes for the children.
According all due respect and weight to the trial court's decision, we nevertheless conclude that the court's factual finding that Mrs. Gonzales is morally unfit is clearly wrong, and that the grant of a change in custody was a clear abuse of the court's discretion. The best interest of the two little girls will best be served by continuing their custody with their mother.
*194 As noted by the trial court, there are numerous appellate decisions involving somewhat similar facts as are presented in the instant case. In some of those cases custody has been awarded to the mother and in some to the father. Appellant cites and relies on Stephenson v. Stephenson, 404 So.2d 963 (La.1982); Cleeton v. Cleeton, 383 So.2d 1231 (La.1979); Monsour v. Monsour, 347 So.2d 203 (La.1977); and Coltharp v. Coltharp, 368 So.2d 793 (La.App.2d Cir. 1979). Appellee cites and relies on Tabor v. Tabor, 421 So.2d 1185 (La.App.2d Cir.1982); Bagents v. Bagents, 419 So.2d 460 (La. 1982); Schexnayder v. Schexnayder, 371 So.2d 769 (La.1979); Bride v. Thom, 378 So.2d 152 (La.App. 1st Cir.1979); and Beck v. Beck, 341 So.2d 580 (La.App.2d Cir.1977).
Our decision in this case would seem to run headlong into the recent 4-3 decision of the supreme court in Bagents v. Bagents supra, and the recent decision of this court in Tabor v. Tabor, supra, both of which involved facts similar to those involved in the instant case. In both cases custody was awarded to the father. The facts of those cases are distinguishable in some particulars. In Bagents, the mother who was living in concubinage expressed the view that it was not wrong. She did not marry her paramour until after the change of custody rule had been tried and decided. In Tabor, an original custody determination, the mother lived in concubinage prior to her legal separation, had not married her paramour, and sought to deceive the court about her relationship.
Tabor recognized the "difficulty and futility of attempts to reconcile the many reported opinions in child custody disputes." Appellate decisions cannot be taken as establishing hard and fast guidelines in these cases and a factor or principle determinative of the decision in one case may not be controlling in another case because each case deals with a peculiar parental relationship; each case must be determined on its own facts. In determining the best interest of the children in custody cases, there must be a weighing and balancing of the factors favoring or opposing custody in the respective competing parents, on the basis of the evidence in the particular case.[1]
Both Bagents and Tabor emphasized the vast amount of discretion vested in the trial court and Bagents discussed the proper allocation of trial and appellate functions between the respective courts. Entirely mindful of this important principle which is the most common thread running through the reported appellate decisions in child custody cases, the appellate court must, nevertheless, exercise its constitutionally mandated duty to review appeals on both the law and facts, and within the scope of proper allocation of functions between the trial and appellate courts, exercise its collegiate judgment in determining whether a trial court decision is clearly wrong or constitutes a clear abuse of discretion.
The judgment of the district court changing custody of the children is reversed and set aside and appellee's petition to change custody is rejected. The custody judgment signed on November 24, 1981 is reinstated in full force and effect.
Reversed and rendered.
NOTES
[1] It should be noted, however, that the 1982 amendments to LSA-C.C. Arts. 146 and 157, which became effective January 1, 1983 and are not applicable to the judgment under consideration in this case rendered prior to that date, introduce new approaches and considerations in the judicial determination of child custody matters.