391 So.2d 577 (1980)
Patricia H. HILDERBRAND
v.
William C. HILDERBRAND.
No. 11628.
Court of Appeal of Louisiana, Fourth Circuit.
November 12, 1980.
Rehearing Denied December 19, 1980.
Writ Refused February 6, 1981.
Reed & Reed, Bruce G. Reed, J. D., New Orleans, for plaintiff-appellee.
Dunn & Rasch, Ltd., J. Morris Dunn, III, Metairie, for defendant-appellant.
*578 Before REDMANN, GULOTTA and BARRY, JJ.
BARRY, Judge.
This matter involves an initial custody determination of three minor children born during the marriage of Patricia and William Hilderbrand.[1]
The uncontested facts show the parties were married in 1965 and began living apart in May, 1976. Following the separation the children lived with their mother until May, 1978, after which the father had custody until January, 1980. From then until trial one month later the mother had custody.
In March, 1977 Mrs. Hilderbrand filed for a legal separation alleging cruel treatment and she requested custody. The husband answered with a general denial and reconvened charging his wife with adultery and he also sought custody of the children. The wife responded to the reconvention with a general denial and supplemented her original petition by stating that the parties had lived separate for more than one year and she prayed for a divorce. A divorce was granted based upon their living separate for more than one year, but alimony was denied to the wife because she was found at fault. The lower court awarded custody to the mother subject to reasonable visitation by their father.
The father appeals the custody judgment alleging that his former wife is unfit because of an extended and open adulterous relationship. The wife answered the appeal urging that there was no abuse of discretion by the trial court.
Mr. Hilderbrand is a Commander in the Navy and his work requires that he travel to various military installations. After the Hilderbrands separated, and following an extended overseas assignment, Mr. Hilderbrand returned home for a ten day visit during October, 1977. The children stayed with him and his wife temporarily moved in with a neighbor. It was at this time that Mr. Hilderbrand was told by his children that his wife was having an afair with a man named Philip Clesi. Before returning overseas he questioned his wife about this information; specifically, he confronted her with the allegation that Clesi had spent the night in their family home and that she and their children stayed overnight at the Clesi residence. She denied the allegation. Mr. Hilderbrand testified he admonished his wife about these accusations but did not have the opportunity to resolve the situation because he had to return to active duty.
In January, 1978 Mrs. Hilderbrand and her children moved from the family home to an apartment. In April, 1978 Mr. Hilderbrand returned to New Orleans and the children went home for visitation with him. He found that the relationship with Clesi had continued during his absence, but his wife again denied the illicit affair. His reaction was to insist that the children live with him. A few days later the May 3rd flood occurred causing extensive damage to Mrs. Hilderbrand's apartment. Almost simultaneously, she encountered problems at her job which she quit and apparently the aggregate of circumstances resulted in an emotional breakdown requiring hospitalization. Around June 15, 1978 Mr. Hilderbrand took the three children with him to live at his new duty station outside of the nation's capital in Virginia.
Mr. Hilderbrand rented a five bedroom home in a residential suburb of Washington and employed a full-time housekeeper to live on the premises. Pictures of the home in evidence show it to be commodious and attractive. The children attended school three blocks from home and they participated in student activities and attended social functions and church. The housekeeper prepared meals, performed domestic chores, and took care of the children. The father went to work early on weekdays and returned each evening in time to have dinner with the children. Weekends were spent together doing a variety of things, such as going to movies and local attractions, plus brief out-of-town trips.
*579 During the father's custody he voluntarily paid for long distance calls between the children and their mother. He also provided money for an airline ticket to allow Mrs. Hilderbrand to visit the children. Further, the mother was permitted to use his gasoline credit card when she drove to Washington for visitation.
In January, 1980, while Mr. Hilderbrand was out of the country, his wife went to Washington and without his knowledge or approval took the children back to New Orleans to live with her. Immediately upon his return Mr. Hilderbrand filed a writ of habeas corpus which resulted in the custody hearing now before us on appeal.
At trial Mrs. Hilderbrand finally admitted that she became involved in an adulterous relationship with Clesi in 1976. She testified that she allowed her paramour to sleep in the family home five or six times while the children were present in a separate bedroom of the house. She further admitted that the children saw her in bed with Clesi on more than one occasion, but denied there was any sexual activity committed in their presence. She further testified that her oldest daughter served breakfast in bed to her and Clesi, and the three children would join them in bed to read the newspaper. These activities occurred between May, 1976 and May, 1978 at which time Clesi was legally separated but not divorced.
During the nineteen months the children lived with their father Mrs. Hilderbrand changed employment several times seeking to improve her position as a nutritionist. She traveled to Michigan and then to Baltimore where she had an opportunity to visit the children. When she returned to New Orleans she stated that she was having financial difficulty and received assistance from Clesi. Their adulterous relationship became full blown when they began living together openly. Mrs. Hilderbrand even testified that people in the neighborhood knew that they were living together, an admission that would have been difficult to prove except for her candid admission.
Each parent was complimentary of the other's ability and desire to take care of the children. Mr. Hilderbrand earns approximately $31,000.00 per year and Mrs. Hilderbrand's income amounts to about $15,000.00 per year.
In order to determine which parent is best fit to have custody under these facts, two questions should be considered:
Should the father's military career and its required travel cause him to be unfit or less fit than the mother?
Has the mother's adulterous relationship rendered her unfit for custody or less fit than the father?
Mr. Hilderbrand testified that after sixteen years of military service his obligation for travel now amounts to five trips a year which vary from overnight to about a week in duration, one trip requiring about three weeks. As a member of the military his base is subject to change, but he stated that future locations would allow him to take his children. The testimony shows that Mr. Hilderbrand is capable of providing good care of his children and during his brief absences they are properly cared for. A neighbor of Mr. Hilderbrand's in Virginia testified that his housekeeper was her friend, they visited each other's homes, and that her nine year old daughter often played with the Hilderbrand children. She substantiated the quality of the living conditions and verified Mr. Hilderbrand's testimony concerning the children's activities with their father. The neighbor painted an overall picture of a very settled family lifestyle. There are no allegations of misconduct attributed to the father.
Our grave concern is the adulterous relationship of Mrs. Hilderbrand with Clesi which began in 1976 and continues. Jurisprudence has expanded to a liberal attitude which now allows several acts of adultery with the same paramour without concluding that the mother is unfit and unsuited for custody. Monsour v. Monsour, 347 So.2d 203 (La.1977). However, if the parent lives in open and public adultery for a substantial period of time in disregard of moral principles of our society then she is unfit *580 for custody. Monsour, supra. For whatever value, Mrs. Hilderbrand testified that when she took the children away from their father in January, 1980 she discontinued sleeping with Clesi. However, at the trial she admitted that they were still seeing each other and planned to be married following her divorce. Her divorce was rendered February 29, 1980 and during argument before this Court, eight months later, Mrs. Hilderbrand's counsel stated that Clesi was still her fiance but that they were not married.
We feel the flagrant conduct of Mrs. Hilderbrand in maintaining an open adulterous relationship over a long period of time warrants and mandates a denial of custody. She did not have sex with her paramour in the presence of the children, but to have her daughter serve them breakfast in bed and have all of the children join them in bed to read the newspaper leaves very little to one's imagination as to the mother's conduct. We feel this conduct is not only contrary to moral standards, even under today's concept, but is also detrimental and damaging to these three young children who are old enough to comprehend and young enough to be affected as a result.
The paramour was a witness for Mrs. Hilderbrand. Clesi testified that during the father's absence on military duty he not only slept in the Hilderbrand home while the children were present in the house, but Mrs. Hilderbrand even took her children to Clesi's home where they spent the night with his son. Clesi's testimony showed that his activities in the Hilderbrand home amounted to those of a substitute father. When questioned about his openness with the mother in front of the children, his response was that he would not do anything with the Hilderbrand children that he would not do with his own son.
The record is void of any negative circumstances which could affect the children under the custody and guidance of their father. His brief absences because of required trips are negated by his devotion and the family environment he provided. Mr. Hilderbrand's absences compared to Mrs. Hilderbrand's lifestyle with her children are not comparable problems. The evidence shows that both parents love the children, but we feel it is clear that Mrs. Hilderbrand chose to totally disregard basic moral concepts during the two years she had the children with her. The fact that her illicit affair continued while the children lived away with their father and became open and public, is no less important. Emphasis that the mother and her lover have lived separate for the past months is insignificant because their relationship continues, however discreet.
In Beck v. Beck, 341 So.2d 580 (La. App. 2nd Cir. 1977) the mother of a seven year old boy admitted living in open concubinage for four or five months with a married man who was judicially separated. The mother said her son never saw the two undressed or having sex. She felt because her son had no knowledge of sexual matters the adulterous activity did not harm the boy. The Beck court disagreed citing Tuggle v. Tuggle, 235 So.2d 166 (La. App. 2nd Cir. 1970):
"It is within common knowledge and experience that a child learns by example, especially from his parents. Such utter disregard for moral guidance and social standards can have but ill affect on the young son." Beck, supra, at p. 582.
In Beck the mother also urged that she redeemed herself by requiring her paramour to move out and by discontinuing sexual relations. This failed to impress the court which emphasized that: "Past misconduct forms an important consideration in determining the present suitability of a parent ...", Beck at p. 582, quoting Borras v. Falgoust, 285 So.2d 583 at p. 588 (La. App. 4th Cir. 1973).
In McCurdy v. McCurdy, 369 So.2d 1216 (La. App. 2nd Cir. 1979) the mother left the matrimonial domicile and took her two children to another city to live with a man where she remained for five months. The trial court denied her custody of her four and eight year old sons because of these circumstances. The court stated its reliance on a number of cases holding that it *581 is not in the best interests of children to award their custody to a mother where she has recently lived in open and public adultery with her paramour for a substantial period of time in total disregard for moral principles of society. Murray v. Murray, 220 So.2d 790 (La. App. 1st Cir. 1979); Tuggle v. Tuggle, 235 So.2d 166 (La. App. 2nd Cir. 1970); Johnson v. Johnson, 268 So.2d 114 (La. App. 3rd Cir. 1972).
In Schexnayder v. Schexnayder, 371 So.2d 769 (La.1979), a husband was granted a divorce based on adultery but the trial court gave his wife custody of four and six year old children. The wife met her paramour approximately once a week for four months. She met the man in various parts of town and they would go to a hotel or other location for sex. She made no effort to conceal her activities in a rural area even though their relationship was interracial. Evidence tended to show that the wife was either unable or unwilling to discontinue the relationship. The trial judge reasoned that numerous cases have held that a brief affair or isolated instances of adultery, not shown to have been conducted in the presence of children, are insufficient to deny custody to a mother who is otherwise suitable. The Supreme Court reversed and said: "... when the mother has consistently engaged in a course of open and public adultery in defiance of generally accepted moral principles and in disregard of the embarrassment and injuries which might be sustained by the children, then the court is justified in depriving her of the care of the children, and in awarding custody to the father or to some other party lawfully entitled to it." Schexnayder at p. 772, citing Monsour, supra; Salley v. Salley, 116 So.2d 296 (La.1959); Beck, supra; Parker v. Parker, 304 So.2d 681 (La. App. 3rd Cir. 1974), writ denied 307 So.2d 641 (La.1975).
The purpose of the above jurisprudentially established rule is not to punish the mother but to protect the children. We recognize that in some cases infrequent indiscretions may be borne out of human frailty rather than an absence of moral character. In such cases the children are not involved and the adulterous affair will not militate against the person claiming custody. However, if a parent engages in open and public adultery over a period of time, in defiance of generally accepted moral principles, in total disregard of any embarrassment and injuries which might occur to children of the marriage, then this misconduct creates a strong negative consideration in determining suitability for custody. Beck, supra; Monsour, supra; Borras, supra. We believe this because common knowledge and experience teaches that a child learns by example, especially from the parents, Beck, supra. It is a parent's duty to demonstrate to his or her children qualities of good moral character. Consequently, parents fail in that duty when they openly and notoriously display an utter disregard for moral and social values in the area of sexual fidelity toward each other and thus forfeit the moral leadership owed their children. Schexnayder, supra, at p. 773.
"The paramount consideration in determining to whom custody should be granted is always the welfare of the children." Fulco v. Fulco, 254 So.2d 603 (La.1971); Montgomery v. Montgomery, 383 So.2d 1384 (La. App. 4th Cir. 1980); Schnexnayder, supra, at p. 772.
In making a custody determination based upon a parent's lifestyle "... we consider whether the behavior was damaging to the children, i. e., if the children were aware of the illicit relationship, whether sex play occurred in their presence, whether the furtive conduct was notorious and brought embarrassment to the children, and what effect the conduct had on the family home life." Howes v. Howes, 388 So.2d 1182 (La. App. 4th Cir. 1980).
We are aware that trial court custody decisions are seldom disturbed on appeal. However, when reversal has been granted the facts generally involve open adulterous activities within the knowledge of the children. We have articulated above a solid foundation to conclude that the trial judge committed manifest error in granting custody to the mother. We are satisfied that *582 Mr. Hilderbrand will be able to provide a healthy and stable environment in which to raise his children. Impact upon the children by changing custody would be minimal because the children recently lived for approximately twenty months with their father.
Accordingly, the judgment of the District Court is hereby reversed and custody of the three minor children is awarded to William C. Hilderbrand effective immediately upon rendition of this judgment. Visitation in favor of Patricia H. Hilderbrand shall be allowed if mutually agreeable between the parents or subject to a determination by the District Court, if necessary. Costs of this appeal to be paid by the appellee.
REVERSED.
NOTES
[1] At the time of trial the children's ages were Kathryn-10, David-8, and Elizabeth-6.