BARNES, J.,
 

 for the court.
 

 SUMMARY OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 1. Tammy and David Morris were married on December 17, 1988, in Clinton, Mississippi, and two children were born of their marriage: Victoria, age 9, and Courtney, age 8. On September 17, 2003, Tammy filed a complaint for divorce in the Chancery Court of Forrest County alleging habitual cruel and inhuman treatment and adultery or, in the alternative, irreconcilable differences. The complaint sought equitable distribution and alimony. Within the complaint was a motion for temporary relief which sought, among other things, temporary custody of the children,
 
 *480
 
 with reasonable temporary visitation rights for David, and temporary spousal and child support. David and Tammy subsequently reached an agreement; thus, in a temporary decree, the chancellor ordered that David and Tammy have joint legal and physical custody of the children. However, David, an officer in the military, was subsequently called to active duty and required to leave the country for an extended period of time; therefore, the chancellor subsequently amended the temporary decree to award temporary custody of the children to Tammy. The amended decree also required David to pay $750 per month in child support.
 

 ¶ 2. In June 2005, Tammy filed a complaint requesting that the chancellor hold David in contempt based on the fact that he was two months delinquent in his child support obligation. In April 2005, after he had returned from active duty, David filed a motion seeking visitation rights and a reduction in his child support obligation. The chancellor issued an amended temporary order that reduced David’s child support obligation to $500 per month beginning on May 1, 2005; however, the chancellor delayed ruling on whether David should have to pay the additional $250 per month for May, June, and July 2005 until the trial. '
 

 ¶ 3. In July 2005, Tammy filed another complaint for citation of contempt based on,
 
 inter alia,
 
 her allegation that David continued to be delinquent in his child support obligation. David subsequently filed a motion for a ninety-day continuance on the ground that his military duties prevented him from participating in a trial. The chancellor then entered an order stating that the issue of David’s contempt and Tammy’s attorney’s fees would be reserved for a later hearing date. The chancellor granted David’s motion for a continuance, and the trial was ultimately held on February 8-9, 2006. Thereafter, on June 5, 2006, the trial court entered an order nunc pro tunc to November 10, 2005, which increased David’s child support obligation to $1,100 per month and reserved the contempt issues for trial.
 

 ¶ 4. Called as an adverse witness, David was first to testify. He stated that he was a major in the National Guard and a lieutenant on the Hattiesburg, Mississippi police force. He served in Bosnia in 1997 and in Iraq from January 2004 to February 2005.
 
 [1]
 
 David testified that he had not worked for the Hattiesburg Police Department in a day-to-day capacity since November 2003. He was, however, on active duty with the military at the time of the hearing, serving as the safety officer at Camp Shelby. David stated that he had recently received an extension that would allow him to continue to serve in that position through March 2007 unless the deployment was ended. Although David’s hours as a safety officer were 7:00 a.m. to 4:00 p.m., he was on call twenty-four hours a day, seven days a week. David stated that since his oldest child was born, he had been on active duty and deployed overseas two times — to Bosnia and Iraq, and it was possible that he could again be deployed overseas. According to David, if he was deployed while he had custody of his children, he would be required by the Army to derive an acceptable care plan for his children prior to leaving. He later testified on direct that this plan would be for his mother to have custody of the children with Tammy having “50 percent of the visitation, just like it should be.” When advised by the trial judge that Tammy “may object” to that plan because “the natural mother would come before the grandparents,” David responded that “I really
 
 *481
 
 wouldn’t mind that, to be honest with you, with some oversight” regarding visitation for his mother. David conceded that Tammy was an “adequate mother.”
 

 ¶ 5. After he and Tammy separated and the temporary order had been entered by the trial court, David purchased a house worth $98,000, in which he had approximately $6,000 of equity at the time of the trial. According to David, his mother lived with him in the house occasionally, usually on the weekends. He stated that his mother was available to stay at the house whenever it was necessary in order to take care of the children. David testified that he purchased a forty-acre parcel of land located in Jasper County, Mississippi (the Jasper County property) from his uncle as an investment with family income during the time he and Tammy were married. The property appraised for $42,000. When asked whether he conceded that this parcel of land was marital property, David acknowledged he and Tammy bought the land for their children through their joint efforts during their marriage. David also owned two other parcels of land, one located at 1646 Old Highway 49, Hattiesburg, Mississippi (the Old Highway 49 property), valued at $32,000, and the other known as the Dixie property, valued at $35,300. Both properties were purchased during the time he and Tammy were married. David conceded that the Dixie parcel was titled jointly between himself and Tammy and was marital property. According to David, he purchased the Old Highway 49 property during a period of time when he and Tammy were separated in or around 1990. David purchased the parcel jointly with his mother, but it was eventually titled solely in David’s name. He testified that although he made some of the payments out of his account, he obtained the money for the payments from his mother’s paycheck. He denied that he used any of his or Tammy’s money to make payments on the property. As to personal property, David testified that he collected coins and that the vast majority of his coin collection was acquired during the time he was married to Tammy. David also had an extensive gun collection. Some of the guns were acquired prior to his marriage to Tammy, and some were acquired during the marriage.
 

 ¶ 6. David testified that he was paying Tammy child support. He stated that he did not pay the $500 payment for June 2005, and he did not know if he paid the April 2005 payment of $750. According to David, he was not aware that his child support obligation was increased to $1,100 per month in November 2005; so he had not been making the $1,100 payments; rather, he had paid $500 per month from November 2005 to January 2006.
 

 ¶ 7. Sandra Inman, Tammy’s mother, testified that, in her opinion, Tammy was a “very good and caring mother,” and for the previous nine years, Tammy primarily cared for the children. She stated that Tammy spent a lot of time with the children, helping them with their homework and taking them to all of their school functions and to church. According to In-man, David was absent from the home a great deal due to his military duties, work schedule, and hunting. Inman testified that while David was deployed in Iraq, Tammy was responsible for caring for the children. She stated that Tammy and the children were very close, and she thought Tammy had a “good moral character” that she instilled in the children. She further stated that it was in the best interest of the children for them to live with Tammy.
 

 ¶8. Inman testified that in the time since Tammy and David had separated and filed for divorce, Tammy had begun a relationship with another man, Keith Rutland. According to Inman, Rutland had spent
 
 *482
 
 the night at her house once, but not in the presence of the children. She stated that Tammy had spent the night at Rutland’s father’s home, but in a separate residence from Rutland. According to Inman, Tammy had told her that she had not had sexual intercourse with Rutland. Inman further stated that Rutland had been around the children early in the relationship, but Tammy had indicated to her that she was no longer allowing that to occur. Inman testified that Tammy only went out with Rutland on weekends when the children were with David.
 

 ¶ 9. Sue Alimón, a good friend of Inman, testified that Tammy and the children were presently residing with her temporarily.
 
 [2]
 
 Alimón stated that Tammy was a good parent in that she fed and clothed the children, got them to school on time, put them to bed on time, and made sure their homework was done. Alimón further stated that Rutland had never visited Tammy in Allmon’s home, and she had never kept the children while Tammy visited Rutland.
 

 ¶ 10. Tammy was next to testify. She stated that when she and David first separated, she moved into a three-bedroom house in Hattiesburg, and the children were attending private school. However, she subsequently realized that she would not be able to afford to continue sending the children to private school, and she did not think that David would help pay for it; so she moved the children to public school in the Oak Grove school district. After Hurricane Katrina, Tammy and the children moved into an apartment for three months, following which they moved in with Alimón. Tammy testified that her long-term goal was to find a home in the Oak Grove school district with a yard and enough bedrooms that the children could have their own rooms.
 

 ¶ 11. With regard to Rutland, Tammy stated that she and David separated in August 2003, and she started seeing Rut-land in February 2004. She testified that the children did have some interaction with Rutland initially, but she decided that it was not a good idea. Therefore, she and Rutland only saw each other on their lunch breaks and on the weekends that she did not have the children. According to Tammy, she and Rutland had not had sexual intercourse.
 

 ¶ 12. Tammy testified that Rutland was not the reason she and David were divorcing; rather, it was because of David’s physical and verbal abuse and the fact that he was unfaithful. She stated that when they were still married, she became suspicious of a woman, Sandra Kay Pittman, who lived in their apartment complex and with whom David had become friends. According to Tammy, David and Pittman talked on the phone a great deal; so Tammy programmed David’s police scanner in order to allow her to listen to David’s phone conversations. She stated that in these conversations, David and Pittman would say that they loved each other, and one time “they said it was good last night.” Tammy did not immediately confront David about Pittman; instead, she kept listening to his conversations and then began following him.
 
 [3]
 
 She stated that “it was very obvious that they had contact with one another, either [by] phone or seeing each other every single day, and
 
 *483
 
 after listening to several phone conversation[s], it was — it was for sure an affair.” Tammy finally confronted David in February 2003. According to Tammy, David’s reaction was to ask, “Who knows about— who all knows about this?” Tammy stated that David denied the affair and refused to stop having contact with Pittman. However, Tammy testified that David had admitted to having an adulterous affair during their marriage, but not with Pittman. She stated that the admitted affair was during the time she was living in Wyoming for purposes of work. After David admitted that affair and apologized, he and Tammy agreed to continue the marriage.
 

 ¶ 13. Tammy testified that she has a bachelor’s degree in merchandising and marketing as well as a Masters of Business Administration. She stated that her job, which she started two weeks prior to the trial, entailed assisting with the budgets on several grants in the disability studies department at the University of Southern Mississippi, where she was currently earning a salary of $35,000 per year. Tammy testified that she typically worked regular business hours, Monday through Friday from 8:00 a.m. to 5:00 p.m., while David had worked all different types of shift work including midnight shifts for a period of time. Moreover, she stated that David’s military work required him to be absent fairly often. She stated that she had worked throughout most of the marriage, although there were some short breaks between jobs. According to Tammy, her current boss was very family oriented and understanding of her need to miss work occasionally for the children, and her job had no requirement of travel or overtime. Until approximately three months prior to obtaining this job, Tammy had worked at Forrest General Hospital for approximately two years doing medicaid billing. She left that job because the pay was too low, and there was no opportunity for advancement.
 
 [4]
 
 According to Tammy, during the time that she was married to David, he was primarily responsible for the financial management of the household.
 

 ¶ 14. Tammy testified that she was currently paying a portion of the rent at Allmon’s residence, but she expected her rent obligation to increase were she to move. As for the real estate, Tammy testified that she and David bought the Dixie property and the property in Jasper County together and owned it free and clear.
 
 [5]
 
 With regard to property in Forrest County that David’s mother originally owned, Tammy stated that she knew David’s mother might have paid some money on it; however, she and David primarily paid for it.
 

 ¶ 15. Tammy testified that the children, daughters, were approaching puberty and, therefore, should be with her through that time. She stated that David was never interested in helping the children with their hygiene needs. According to Tammy, she did ninety-five percent of everything they needed — “their day-to-day needs, cooking for them, giving them baths, helping them with their homework, getting them to bed. Anything they needed, I did all of that the majority of the time.” She stated that she was primarily
 
 *484
 
 responsible for attending to the children when they were sick. Tammy testified that when she and David were still living in the same household, she typically woke the children up in the morning, cooked their breakfast, helped them get dressed, and took them to school. Then, in the evening she would come home from work and cook dinner. Tammy stated that after dinner, she was usually the one to help the children with their homework and put them to bed. However, Tammy acknowledged that both she and David participated in the girls’ extracurricular activities. Tammy testified that she had been primarily responsible for taking the children to the doctor, although David and his mother had taken them a few times. She stated that she talks to the children’s school teachers almost daily and goes to their school parties and functions.
 

 ¶ 16. According to Tammy, she took the children to counseling in order to deal with David’s “short fuse and ... bad temper and a lot of physical abuse”; she also took them to counseling to help them get through the divorce proceedings. Tammy stated that David would yell at her and the children until they were “just literally so shaken,” and David spanked the children too hard on certain occasions. According to Tammy, David spanked one of the children so hard on one occasion that the child urinated on herself. Tammy recalled another incident that occurred two or three years before she and David separated. She stated that David came home very angry one day after he had been reprimanded at work. -Tammy had hooked up a telephone in the children’s room, and sometimes when someone would call, the children picked up their phone at the same time David picked up the other phone, resulting in David’s not being able to hear the caller. On one such occasion, according to Tammy, David “grabbed the biggest butcher knife out of the kitchen and charged up the stairs.” Tammy stated that she and children met David at the top of the stairs; David was holding the knife over his head and said he was going to cut the phone cord. According to Tammy, after David left, one of the children said that she thought David was going to kill Tammy.
 
 [6]
 

 ¶ 17. After being recalled to the stand, David conceded that he and Tammy bought the Jasper County property for their children through their joint efforts during their marriage. David also acknowledged that the Dixie parcel was titled jointly between himself and Tammy and was marital property. However, David contested the claim that the Old Highway 49 property was marital property-
 

 ¶ 18. David testified that other than one job, Tammy never held a job for more than two or three years, while he had held numerous jobs at one time to support the family. He stated that he contributed at least two-thirds of the money to the marriage. With regard to Tammy’s contribution to the stability of the marriage, David testified that the family could never go on vacations because Tammy normally did not stay at any given job long enough to get vacation time; moreover, on two occasions when she did have vacation time, she used it to go on vacation with other people.
 
 [7]
 
 David testified that he and Tammy never went on any vacation together other than their honeymoon.
 

 
 *485
 
 ¶ 19. David stated he paid for Tammy’s education, approximately $400 per quarter; one of Tammy’s employers had agreed to reimburse them for the cost, but this offer was contingent upon Tammy’s continuing to woi’k for the employer. According to David, when Tammy quit, the employer stopped paying and attempted to have Tammy pay back the money. The employer then turned the debt over for collection, and David negotiated a plan whereby he could pay $50 per month on the debt with no interest. He stated that he paid this amount until he and Tammy separated, at which time he turned the payments over to Tammy.
 
 [8]
 

 ¶20. David disagreed with Tammy’s contention that she had provided the majority of the care of the children prior to the couple’s separation. He stated that he, Tammy, and his mother took care of the children’s basic needs on a daily basis prior to the separation. According to David, he was the one who did the grilling when the family would grill outside. He acknowledged that Tammy did most of the laundry, and although he and Tammy took turns bathing the children when they were young, he did not feel that he should be bathing them once they got older. David testified that he took them to school some of the time, and also his mother and a family friend took them to school sometimes. He further stated that Tammy rarely cooked them breakfast; rather, they would either have cereal or stop to get donuts on the way to school. David testified that he tried to have the children in bed by eight o’clock, and he helped them with their homework. David further testified that he kept in touch with the children’s teachers. According to David, if he were to be awarded custody of the children, his mother would take care of the children on a daily basis while he was at work. Similarly, if he was again deployed to Iraq, his mother would take care of the children.
 

 ¶21. David testified that he provided the majority of the family’s income. He further stated that his mother predominantly took care of the children with the exception of when Tammy was at the house. David denied that his multiple jobs kept him away from home and the children all the time. He stated that he lived in a three-bedroom home in an older, established neighborhood, and the children had friends in the neighborhood. According to David, Tammy had moved with the children four or five times since he went to Iraq, and the children had four or five different babysitters since then.
 

 ¶ 22. David denied that he ever put a gun to his head as Tammy claimed. He admitted running up the stairs with a knife, but he denied that he did so in a manner indicating that he was going to attack anyone. David also admitted to having an affair with another woman in 1990 or 1991 while he and Tammy were married and Tammy was living in Wyoming. He stated that Pittman was only a friend, and he did not have an affair with her.
 

 ¶ 23. David’s mother, B.J. Morris, testified that she stayed with David for part of the week, and the other part of the week she stayed at the house of a man for whom she was the caretaker. She stated that she had her own room at the man’s house. According to B.J., she often kept the children after school or picked them up from daycare, and she had taken them to the doctor on many occasions. She stated that she “had them practically every day” and was more or less the children’s nanny. B.J. testified that during the year that David was deployed overseas, she kept a
 
 *486
 
 diary detailing what she did with the children in order to let David know what was going on at home. She testified that during that year, while the children were attending school at Sacred Heart, she picked them up from school almost every day, although Tammy sometimes had Robert Edwards, described as the children’s godfather, pick them up and take care of them after school. According to B.J., she was allowed to have the girls one weekend a month while David was in Iraq, and sometimes she had them several weekends. She stated that Tammy never checked on the children during these weekends. B.J. stated that if David were to be awarded custody of the children, she was prepared to help him care for them. B.J. further stated that David had provided the most care for the children, and David was a better parent than Tammy. David’s sister, Chris Craft, testified that David was a good parent and that he provided more primary care for the children than Tammy. She further stated that B.J. had been more of a caretaker for the children than Tammy. Craft testified that she was willing to help David take care of the girls if he were awarded custody.
 

 ¶ 24. Following the hearing, the chancellor issued findings of fact and conclusions of law dividing the marital and non-marital assets between David and Tammy. The chancellor awarded Tammy custody of the children subject to David’s visitation rights and ordered David to pay $1,000 per month in child support. The chancellor also found that David was delinquent in his child support payments, found him in contempt, and ordered that he pay $8,950 in back child support and attorney’s fees.
 

 ¶ 25. Aggrieved, David now appeals arguing the following grounds for relief: (1) the chancellor erred in awarding custody of the minor children to Tammy by not applying the
 
 Albright
 
 factors and by discriminating against David because of his military service; (2) the chancellor did not properly address the
 
 Ferguson
 
 factors and specifically did not give David credit for properties titled only in his name for which he was the main contributor to the acquisition; (8) the chancellor erred in finding David in contempt of court; and (4) the chancellor erred in failing to make a written finding that the application of the statutory child support guidelines was unreasonable under the circumstances of this case pursuant to Mississippi Code Annotated section 43-19-101 (Rev.2004). Finding no error, we affirm the judgment of the chancery court.
 

 STANDARD OF REVIEW
 

 ¶ 26. “In domestic relations cases the scope of review is limited by the substantial evidence/manifest error rule.”
 
 Jundoosing v. Jundoosing,
 
 826 So.2d 85, 88(¶ 10) (Miss.2002). “This Court may reverse a chancellor’s findings of fact only when there is no ‘substantial credible evidence in the record’ to justify his finding.”
 
 Id.
 
 (quoting
 
 Henderson v. Henderson,
 
 757 So.2d 285, 289(¶ 19) (Miss.2000)). “Our review in domestic relations is limited under the familiar rule that this Court will not disturb a chancellor’s findings unless manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard.”
 
 Id.
 
 (quoting
 
 Johnson v. Johnson,
 
 650 So.2d 1281,1285 (Miss.1994)). However, “when we review questions of law, a de novo standard of review is applied.”
 
 Bayview Land, Ltd. v. State,
 
 950 So.2d 966, 972(¶ 8) (Miss.2006).
 

 DISCUSSION OF THE ISSUES
 

 I. Whether the chancellor erred in awarding custody of the minor children to Tammy by not properly applying the
 
 Albright
 
 factors and by
 
 *487
 
 discriminating against David for his military service.
 

 ¶ 27. David first contends that the chancellor erred in awarding custody of the children to Tammy. He contends that the chancellor punished him on account of his military service and misapplied certain
 
 Albright
 
 factors. In determining the issue of child custody, the chancellor utilized the twelve factors set forth in
 
 Albright v. Albright,
 
 437 So.2d 1003, 1005 (Miss.1983), as follows:
 

 We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of employment; physical and mental health and age of parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
 

 Id.
 
 The chancellor in this case found seven factors to be neutral, four to favor Tammy, and one to favor David.
 
 [9]
 
 Unless a chancellor “improperly considers and applies” the
 
 Albright
 
 factors, an appellate court will not disturb the chancery court’s findings.
 
 Hollon v. Hollon,
 
 784 So.2d 943, 946(¶ 11) (Miss.2001). David contends that the chancellor erred in applying the following factors: (1) willingness and capacity to provide primary childcare, (2) employment and responsibilities of that employment, and (3) moral fitness of the parents. Each of these factors will be discussed in turn below.
 

 A. Willingness and Capacity to Provide Primary Childcare
 

 ¶28. The chancellor found that while both David and Tammy had a sincere willingness and desire to gain custody, this factor favored Tammy due to the fact that David was on full active military duty and had previously been deployed to Iraq. David contends that this finding was error on account of his testimony that the mili
 
 *488
 
 tary would work with him in establishing a parenting plan and would not allow him to deploy without such a plan. He also notes that his job is basically a day job. However, while David did testify that his hours for work with the military were 7:00 a.m. to 4:00 p.m., he also acknowledged that he was on call twenty-four hours a day, seven days a week. Moreover, he had been deployed overseas two times since the birth of his oldest child, and it remained possible that he could be deployed again, in which case his mother would take care of the children. Given these facts, we find no error in the chancellor’s finding that Tammy was more capable of providing primary care to the children.
 

 ¶ 29. David relies on
 
 Divers v. Divers,
 
 856 So.2d 370 (Miss.Ct.App.2003), as support for his contention that the fact that the military required that he derive a care plan for his children prior being deployed should have prevented this factor from favoring Tammy. However,
 
 Divers
 
 is readily distinguishable from this case. In
 
 Divers,
 
 the trial court had found that the employment and employment responsibility factor favored the mother because daycare would be provided at the mother’s work but not the father’s, since the father was in the military and stationed at Edwards Air Force base, and also on the ground that the father did not know where he would be assigned in four years.
 
 Id.
 
 at 374-75(¶ 17). This Court found that the chancellor erred in analyzing this factor, stating that “[t]he military is well-known for providing appropriate facilities for servicemen.”
 
 Id.
 
 at 375(¶ 17). The Court also noted that the chancellor did not know where the mother would be in four years either; the mother had not kept a job for any considerable length of time, and she was possibly returning to school.
 
 Id.
 
 at (¶¶ 17-18). Therefore, the Court found that the employment factor favored the father.
 
 Id.
 
 at (¶ 18).
 

 ¶ 30. In this case, however, there is no issue as to whether the military would provide childcare facilities for David and Tammy’s children; rather, the issue is whether David’s military duties affect his capacity to provide primary care for his children. We also note that the
 
 Divers
 
 Court, when discussing the stability of the home environment factor, stated that the father had a regular office job, not a deployment position.
 
 Id.
 
 at 375(¶ 24). David, on the contrary, is always on call and may again be deployed overseas. Accordingly, while we commend David’s service to our country, we find that there is substantial evidence supporting the chancellor’s conclusion that this service has limited his capacity to provide primary care to his children under the circumstances of this case.
 

 B. Employment and Responsibilities of That Employment
 

 ¶ 31. The chancellor found that this factor favored Tammy over David because David’s work for the Hattiesburg Police Department sometimes required him to work odd hours and on account of David’s active military service. David contends that this finding was erroneous due to the fact that Tammy had only been at her current job for two weeks at the time of trial and her employment record was not stable, while he had worked in the same job for twenty years. We, however, find no error in the chancellor’s finding that this factor favored Tammy. “The supreme court has held that a chancellor is justified in awarding custody based in part on one parent’s work schedule.”
 
 Belding v. Belding,
 
 736 So.2d 425, 430(¶20) (Miss.Ct.App. 1999) (citing
 
 Moak v. Moak,
 
 631 So.2d 196, 198 (Miss.1994)). While Tammy’s job his
 
 *489
 
 tory may not have been the most stable,
 
 [10]
 
 Tammy testified that in her current job she worked regular business hours, Monday through Friday from 8:00 a.m. to 5:00 p.m., while David’s job required that he always be on call. Moreover, again, David was on active military duty and could be deployed at any time. Accordingly, the chancellor’s finding that this factor favored Tammy is supported by substantial evidence and will not be disturbed.
 

 C. Moral Fitness of the Parents
 

 ¶ 32. David argues that the chancellor erred in finding that this factor favored neither party. The chancellor noted that David had admitted to having had an affair in the early 1990s and that after the separation, but prior to the divorce, Tammy had been dating another man. David contends that this factor should have favored him because his affair occurred years ago, and he was forgiven by Tammy, while Tammy left him while he was at work and immediately began an affair with Rutland. We disagree. In the instant case, the chancellor made no finding as to whether Tammy had a sexual affair with Rutland or whether David had a sexual affair with Pittman. From our review of the record, there is no stronger evidence of Tammy’s affair than there is of David’s. The only adultery admitted in the record is David’s affair years before the couple’s separation. David notes that Tammy forgave him for his affair; however, while this might be relevant to whether one party is entitled to a divorce, David cites no authority for the proposition that an individual’s forgiving his or her spouse’s affair is of any relevance to the moral fitness factor of a custody determination. Hence, we find no error in the chancellor finding that this factor favored neither party.
 

 ¶ 33. Based on the above findings, we find David’s argument that the chancellor erred in awarding custody of the minor children to Tammy is without merit. David asserts that although the Mississippi Supreme Court has not spoken to the issue, this Court should adopt a rule that military service will not be held against a parent and not be considered in the award of custody.
 
 [11]
 
 We, however, are neither permitted nor inclined to do so; the facts of each child custody case are different, and the military service of a parent may very well be relevant to a custody determination.
 

 
 *490
 
 ¶ 34. “In child custody cases, the best interest of the child must be kept paramount.”
 
 Powell v. Ayars,
 
 792 So.2d 240, 244(¶ 7) (Miss.2001) (citing
 
 Sellers v. Sellers,
 
 638 So.2d 481, 485 (Miss.1994)).
 
 [12]
 
 The chancellor stated that because of the uncertainty over David’s military service, it was in the best interest of the minor children to award custody to Tammy. We find no manifest error in this determination and affirm the chancery court’s judgment awarding custody to Tammy subject to David’s visitation rights.
 

 II. Whether the chancellor erred in failing properly to address the
 
 Ferguson
 
 factors and in failing to give David credit for properties titled in his name and for which he was the main contributor.
 

 ¶ 35. David argues that the chancellor erred in failing to specifically address each of the
 
 Ferguson
 
 factors. In making an equitable distribution of marital assets, chancellors are directed to consider the following factors set forth in
 
 Ferguson v. Ferguson,
 
 639 So.2d 921, 928 (Miss. 1994):
 

 1.Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
 

 a. Direct or indirect economic contribution to the acquisition of the property;
 

 b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
 

 c.Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
 

 2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
 

 3. The market value and the emotional value of the assets subject to distribution.
 

 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
 

 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
 

 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
 

 7. The needs of the parties for financial security with due regard to the combina
 
 *491
 
 tion of assets, income and earning capacity; and,
 

 8. Any other factor which in equity should be considered.
 

 ¶ 36. “This Court has reversed decisions where, even though the chancellor may have actually applied the
 
 Ferguson
 
 factors, the chancellor failed to make specific findings on the record.”
 
 Owen v. Owen,
 
 798 So.2d 394, 399(¶ 13) (Miss.2001) (citing
 
 Kilpatrick v. Kilpatrick,
 
 732 So.2d 876, 880-81(¶19) (Miss.1999)). “At the same time, not every case requires consideration of all eight of the factors.”
 
 Id.
 
 Rather, the chancellor “may consider only those factors he finds ‘applicable’ to the property in question.”
 
 Id.
 
 (quoting
 
 Carrow v. Carrow,
 
 741 So.2d 200, 202(¶ 10) (Miss.1999)). In this case, after listing the
 
 Ferguson
 
 factors, the chancellor stated as follows:
 

 Both parties worked and contributed financially to the marriage. These contributions are summarized in each of their Social Security Statements. Market value of the parties’ assets was determined by appraisals, by stipulation, and, in some instances, by the parties’ estimates on their financial declarations. Each party has good earning capacity and David has enjoyed a much more significant income because of his active military service.
 

 The chancellor then divided David and Tammy’s marital assets into five categories and made detailed findings as to each category regarding the value of the items in the category and the contribution of each party thereto. Therefore, contrary to David’s contention, the chancellor did consider numerous
 
 Ferguson
 
 factors, namely the parties’ contribution to the marriage, the market value of the assets, and the parties’ earning capacities. David relies on
 
 Daniels v. Daniels,
 
 950 So.2d 1044, 1045(¶ 5) (Miss.Ct.App.2007), in which this Court reversed and remanded the case based on the fact that “[n]o discussion of the factors [was] found in the record, and no explanation of how the chancellor found as to any factor, or how those factors impacted the chancellor’s award of marital property, [was] included in the court’s ruling.” Here, however, the chancellor’s judgment reveals that he did consider multiple
 
 Ferguson
 
 factors. As noted above, he was not required to discuss every factor in detail. Therefore, David’s argument in this regard is without merit.
 

 ¶ 37. David further argues that the chancellor erred in finding the Old Highway 49 property to be marital property. He contends that Tammy admitted that David’s mother, B.J., contributed to paying some of the notes on the property. With regard to this property, the chancellor found as follows:
 

 The home located at 1646 Old Hwy 49 in Hattiesburg, Mississippi was purchased during the marriage and is titled in David’s name alone.... David testified that, while his mother did live in the home at various times throughout the parties’ marriage, she has not occupied the home in quite some time. Tammy and David usually paid the note on the property. At one point, David borrowed money against the home to pay off credit card debt that was incurred as a result of him purchasing collectible coins. When David’s mother testified, she made no mention of the home on Old Hwy 49 as being her property. Marital funds were used to pay the mortgage associated with this house, it is titled in David’s name after a purchase ... and the court ruled at trial that this home is marital property subject to equitable distribution.
 

 “Marital property is defined as ‘any and all property acquired or accumulated during the marriage.’ ”
 
 Bowen v. Bowen,
 
 982
 
 *492
 
 So.2d 385, 395(¶41) (Miss.2008) (quoting
 
 Hemsley v. Hemsley,
 
 639 So.2d 909, 915 (Miss.1994)). “Domestic services and economic services have equal value.”
 
 Id.
 
 “Assets classified as marital property are equitably divided utilizing the
 
 Ferguson
 
 factors, taking into account the parties’ non-marital assets.”
 
 Id.
 
 (citation omitted). “The burden is upon one claiming assets to be non-marital to demonstrate to the court their non-marital character.”
 
 A & L, Inc. v. Grantham,
 
 747 So.2d 832, 839(¶ 23) (Miss.1999) (citation omitted).
 

 ¶ 38. We note initially that the fact that the Old Highway 49 property was titled in David’s name is irrelevant as “title is no longer determinative in deciding a party’s rights to the property.”
 
 Parsons v. Parsons,
 
 741 So.2d 302, 307(¶ 26) (Miss.Ct.App.1999) (citation omitted). In this case, David testified that while the money for the payments on the property may have come from the checking account he shared with Tammy, the money was provided by B.J. Tammy, on the other hand, testified that while B.J. may have paid some on the Old Highway 49 property, she and David primarily paid for it. “Where there is conflicting testimony, the chancellor, as the trier of fact, is the judge of ‘the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation.’ ”
 
 Bowen,
 
 982 So.2d at 395(¶ 42) (citations omitted). In finding the Old Highway 49 property to be marital property, the chancellor obviously found Tammy’s testimony to be more credible, and it was well within his discretion to do so. Moreover, although the chancellor deemed the property to be marital, he ultimately awarded the property to David. Accordingly, we find no error in the chancellor’s findings in this regard.
 

 ¶ 39. David also argues that the chancellor erred in the division of the Old Highway 49 property and the Jasper County property.
 
 [13]
 
 David takes issue with the fact that the chancellor awarded Tammy the Dixie property and the Jasper County property, which had a combined value of $77,300, while David was awarded only the Old Highway 49 property, which had a value of $32,000.
 
 [14]
 
 We disagree. Although the value of the marital real property awarded to Tammy exceeded the value of that awarded to David, it is well established that equitable distribution does not require equal distribution.
 
 Bresnahan v. Bresnahan,
 
 818 So.2d 1113, 1122(¶ 11) (Miss.2002). Moreover, when the distribution of the property is viewed as a whole, there is no basis for finding it to be inequitable. David was awarded the marital asset portion of the gun collection and the coin collection, which were valued at approximately $57,000. He was also awarded the non-marital portion of the gun collection which was valued $15,699.
 

 ¶ 40. Overall, according to the chancellor’s distribution chart, David was awarded approximately $50,000 more in mai’ital assets than was Tammy. This is hardly inequitable. David also takes issue with the chancellor’s division of the cash assets, which he claims resulted in Tammy’s receiving $23,411.49, while he received only $2,851. However, it is unclear how David calculated these figures. The only two categories in the chancellor’s distribution that could contain cash assets are the investments category and the bank accounts
 
 *493
 
 category. In the investments category, David received $41,867.33 worth of marital assets, while Tammy received $25,292.79 worth.
 
 [15]
 
 Furthermore, in the bank accounts category, David received $5,798.72, while Tammy received $8.56. Again, we fail to see the inequity in this distribution.
 

 ¶ 41. David further argues that the chancellor found that he was the primary wage earner but failed to give him any credit for his contribution. As noted .above, the chancellor stated that “David has enjoyed a much more significant income because of his active military status.” However, the fact that David was the primary wage earner and financial contributor does not automatically entitle him to a larger portion of the marital assets. It is well settled in Mississippi that “[d]omestic services and economic services have equal value.”
 
 Bowen,
 
 982 So.2d at 395(¶ 41) (citing
 
 Hemsley,
 
 639 So.2d at 915). Moreover, David did in fact receive a substantially larger portion of the marital assets than did Tammy.
 
 [16]
 

 ¶ 42. “[T]he chancellor’s decision regarding the division of marital property should be viewed as a whole in determining whether he abused his discretion.”
 
 Tillman v. Tillman,
 
 716 So.2d 1090, 1094(¶ 19) (Miss.1998). In this case, when the division of the marital assets is viewed in its entirety, it is clear that David received an equitable distribution.
 
 [17]
 
 Accordingly, this issue is without merit.
 

 III. Whether the chancellor erred in finding David in contempt and thus in awarding Tammy attorney’s fees.
 

 ¶43. David next argues that the chancellor erred in finding him in contempt when it was not clear what order of the court he directly disobeyed or if he had any knowledge of such order. “[I]n a contempt action involving unpaid child support, a prima facie case is achieved when the party entitled to receive child support introduces evidence that the party required to pay the support has failed to do so.”
 
 R.K. v. J.K.,
 
 946 So.2d 764, 777-78(¶ 40) (Miss.2007) (citing
 
 Lahmann v. Hallmon,
 
 722 So.2d 614, 620(¶ 19) (Miss. 1998)). “Then the burden shifts to the party who failed to pay to show an applicable defense, and this proof must be clear and convincing.”
 
 Id.
 
 at 778(¶ 40). The Mississippi Supreme Court has held that “contempt can only be willful.”
 
 Id.
 
 at (¶ 41) (citing
 
 Mizell v. Mizell,
 
 708 So.2d 55, 64(¶52) (Miss.1998)). “A contempt citation is proper only when the contemner
 
 *494
 
 has willfully and deliberately ignored the order of the court.”
 
 Id.
 
 “A chancellor has substantial discretion in deciding whether a party is in contempt.”
 
 Id.
 
 at 777(¶ 39).
 

 ¶ 44. A finding that one party is in contempt renders the opposing party eligible for an award of attorney’s fees; however, “an award of attorney’s fees is not contingent on a finding of contempt.”
 
 R.K.,
 
 946 So.2d at 778(¶ 44). In this case, the chancellor ordered David to pay a portion of Tammy’s attorney’s fees based on-his being in contempt of court. David argues that the chancellor did not make clear what order he had willfully and deliberately denied. With regard to finding David in contempt, the chancellor stated as follows:
 

 Tammy has petitioned the Court to find David in contempt on several occasions. David is $3,950.00 delinquent in child support (See Trial Exhibit 47-David paid $500, not $1,100 for 2/06 and 3/06). The Court finds David in contempt and assesses the aforementioned back child support.
 

 According to exhibit forty-seven, which is a copy of the Forrest County Chancery Clerk’s ledger reflecting the child support payments made by David from January 20, 2004, to October 7, 2005, David failed to pay the $750 child support payment for April 2005 and the $500 payment for June 2005. The document also states that David did not make the $1,100 payments for November and December 2005 and January 2006, resulting in his being $2,750 delinquent in his child support obligation. In addition, the chancellor found that David had only paid $500 in February and March of 2006 rather than $1,100; therefore, David was a total of $3,950 delinquent.
 
 [18]
 

 ¶ 45. Although David does not specifically state as much, we assume that his argument in this regard centers around his contention at trial that he was not aware that his child support obligation was raised to $1,100 in November 2005. As was noted above, on June 5, 2006, the chancellor entered an order, nunc pro tunc to November 10, 2005, increasing David’s child support obligation to $1,100 beginning on November 10, 2005. Similarly, when questioning David at trial, Tammy’s attorney stated that there was an order negotiated and approved by David’s attorney in November 2005 whereby David’s child support obligation was increased to $1,100. We, however, can find nothing in the record documenting any such order, and David testified at trial that he was not aware of the increase to $1,100.
 

 ¶ 46. Nonetheless, Tammy demonstrated at trial, through her own testimony and through exhibit forty-seven, that David failed to pay the $750 payment in April 2005 and the $500 payment in June 2005. David admitted at trial that he did not make the June 2005 payment, and he did not know if he paid the April 2005 payment. Moreover, David made no claim that he was unaware of the requirement that he make the $750 and $500 payments, and the chancellor’s orders setting the payments appear in the record. Therefore, Tammy established a prima facie case of contempt based on David’s failure to pay the $750 and $500 payments, and David failed to show by clear and convincing evidence that this failure was not willful. Accordingly, although it is unclear from the record when and how David’s child support obligation was increased to $1,100 per month, there is ample evidence
 
 *495
 
 supporting David’s being found in contempt for failure to pay the $750 and $500 child support payments. Thus, we find no error in the chancellor’s award of attorney’s fees to Tammy.
 

 IV. Whether the chancellor erred in failing to make a written finding that the child support guidelines were inappropriate under the circumstances of this case pursuant to section 43-19-101(4) (Rev.2004).
 

 ¶47. In his final assignment of error, David contends that the chancellor erred in failing to make a written finding that the statutory child support guidelines were inappropriate under the circumstances of this case and, thus, would not be followed. With regard to child support, the chancellor stated as follows:
 

 According to David’s 8.05 Financial Declaration, he currently has a gross income of $8,400.00 per month and, after allowable deductions, his AGI [adjusted gross income] is over $6,900.00. Twenty percent (20%) of his adjusted gross income, as defined by statute, would be $1,386.00 per month. However, the Court sets child support at $1,000 per month, taking into account statutory discretion and the children’s needs.
 

 “The amount of child support to be awarded in Mississippi is controlled by statute with some discretion left to the chancellor.”
 
 McGehee v. Upchurch,
 
 733 So.2d 364, 371(¶ 37) (Miss.Ct.App.1999). Pursuant to the child support guidelines set forth in Mississippi Code Annotated section 43-19-101(1) (Rev.2004), a parent with two children should pay child support in the amount of twenty percent of his or her adjusted gross income. “[Mississippi Code Annotated] [s]eetion 43-19-101(2) requires a ‘written finding’ or specific finding on the record that the application of the guidelines would be unjust or inappropriate ... as determined under the criteria specified in [section] 43-19-103' in order to effectively overcome the statutory presumption.”
 
 McGehee,
 
 733 So.2d at 371(¶37). “Similarly, [section] 43-19-101(4) reads in part, ‘the court shall make a written finding in the record as to whether or not the application of the guidelines established’ is reasonable.”
 
 Id.
 
 The Mississippi Supreme Court has held that “these provisions, operating in conjunction, at a minimum require some written reference to the guidelines being bypassed and some explanation as to why.”
 
 Id.
 
 (citing
 
 Knutson v. Knutson,
 
 704 So.2d 1331, 1334-35(¶23) (Miss. 1997)). “When a chancellor makes a ruling without specific findings of fact and a party raises the issue of the amount of child support awarded, this Court will send the issue back to the lower court for the mandatory specific findings of fact as to why the chancellor deviated from the guidelines.”
 
 Id.
 

 ¶48. In this case, David makes no challenge to the amount of child support ordered; rather, his only argument is that the chancellor erred in failing to make a written finding that the application of the child support guidelines was unreasonable in this case. We, however, find no reversible error in the chancellor’s failure in this regard.
 

 ¶ 49. In
 
 McGehee,
 
 this Court affirmed the chancellor’s award of child support to the custodial parent despite the chancellor’s failure to make a written finding as to why he did not follow the child support guidelines as is required by section 43-19-101(2), which, as noted above, requires the chancellor to make a written finding that the application of the statutory guidelines would be unjust under the circumstances of the case.
 
 McGehee,
 
 733 So.2d at 371-72 (¶ 36-41). In setting the child support amount, the chancellor had stated that the non-custodial parent “should be required
 
 *496
 
 to pay child support in the amount of 10% of her adjusted gross income (one half of the statutory amount) as determined by Section 43-19-101 MCA by applying the statutory guideline of 20% for the support of two children per month.”
 
 Id.
 
 at 371(¶ 39). In affirming the chancellor’s award of child support, we found that it was “clear [the chancellor] used the statutory percentage as a baseline before adjusting it to fit the circumstances of the parties.”
 
 Id.
 
 at 372(¶ 40) (further finding that the disparity in the incomes of the custodial and non-custodial parent and the young age of the child supported the child support award).
 

 ¶ 50. In this case, although he did not make a written finding as to whether the application of the guidelines was reasonable pursuant to section 43-19-101(4), it is clear that the chancellor considered the twenty percent statutory guideline figure set forth in section 43-19-101(1) in setting David’s child support obligation. Moreover, the chancellor stated that he set the amount of child support “taking into account statutory discretion and the children’s needs.” Finally, the chancellor’s opinion reflects that the amount of the monthly child support that David was ordered to pay was $386 per month less than the amount set forth by the guidelines. Given these facts, and the fact that David makes no contention that the amount of child support awarded was unreasonable, we find no reversible error in the chancellor’s failure make a written finding as to the reasonableness of the guidelines in this case. This issue is without merit.
 

 ¶ 51. THE JUDGMENT OF THE FORREST COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE AND ROBERTS, JJ., CONCUR. CARLTON, J., NOT PARTICIPATING.
 

 [1]
 

 . Two months of this period were spent at Fort Benning in Georgia.
 

 [2]
 

 . Alimón stated that the reason Tammy and the children were living with her was because Tammy's first apartment was damaged in Hurricane Katrina, and she had to leave her next apartment. Also, there was a shortage of rental property in Hattiesburg.
 

 [3]
 

 . Tammy also stated that she examined their cell phone records, and "it was apparent that he called her a lot and she called him a lot.” Then, according to Tammy, David began shredding the cell phone records.
 

 [4]
 

 . She testified that she left the job she had before the one at Forrest General because the Legislature passed a bill eliminating her position unless she was willing to move.
 

 [5]
 

 . She stated that they paid for the debt associated with the Jasper County property with money from their checking account, into which both of their paychecks were deposited each month; they did not allocate certain bills to be paid with his paycheck and certain bills to be paid with her paycheck.
 

 [6]
 

 . Tammy also recalled another incident in which she and David were talking about the problems in their marriage and their financial problems, and David put his gun to his head and said that if he pulled the trigger Tammy’s financial problems would be over.
 

 [7]
 

 . Tammy later stated that one of the trips was for work and one was with her brother.
 

 [8]
 

 . Tammy later stated they spent $1,000 on her education at the most.
 

 [9]
 

 . The chancellor found continuity of care, parenting skills, physical and mental health, emotional ties, and moral fitness to be neutral. Both parents were found to have taken an active role in rearing and nurturing the two girls, and David's mother was found very supportive and instrumental in providing care for the children; thus, the continuity of care factor favored neither party. Likewise, regarding parenting skills, the chancellor found that even though Tammy testified David had a temper and tended to exercise too much discipline, the court found David to be a "caring and devoted father.” The chancellor also found the moral fitness factor neutral, as even though David admitted to committing adultery in the mid-1990s, Tammy frequently allowed her new boyfriend to be in the presence of the children while engaged in numerous other activities prior to the divorce.
 

 The factors that favored Tammy were age, health, and sex of the children (since both of the children are girls); willingness and capacity to care for the children; and employment and responsibilities of each parent. While the chancellor found each party had a sincere desire for custody, the chancellor noted David was on full active military duty and had been previously deployed to Iraq. Furthermore, the chancellor stated Tammy worked regular business hours, while David's schedule sometimes included shifts that required him to work odd hours. The one factor that favored David was stability of the home environment.
 

 [10]
 

 . Despite David's contention that Tammy’s employment history is unstable, the record reveals that at least some of Tammy’s job changes occurred through no fault of her own. For example, she testified that she left the job at Forrest General Hospital because the pay was too low and there were no opportunities for advancement. She further stated that she was forced to leave the job that she had prior to the one at Forrest General because the Legislature passed a bill eliminating her position unless she was willing to move.
 

 [11]
 

 . As support for this argument, David cites two cases from Louisiana, which he states held that a father’s military service should not be held against him in a determination of child custody.
 
 See O’Brien v. O'Brien,
 
 704 So.2d 933, 935 (La.Ct.App.1997) ("Although the father’s military duty makes him subject to move, it should not be held against him.”);
 
 Hilderbrand v. Hilderbrand,
 
 391 So.2d 577, 579 (La.Ct.App.1980) (finding that the father’s military service did not affect his ability to care for his children given that his military service required approximately five one-week trips per year; he could take his children with him if he were to be transferred to a different military base; his children were properly cared for during the brief periods when he was absent; and the testimony showed that the father was capable of caring for the children). We do not read these cases as necessarily establishing a per se rule that a parent’s military service should never be a factor in a custody determination; regardless, these cases are not from Mississippi and, therefore, are not binding on this Court.
 

 [12]
 

 . In its 2008 session, the Mississippi Legislature enacted section 93-5-34 to the Mississippi Code concerning,
 
 inter alia,
 
 the effect of a custodial parent's deployment in child custody matters. Miss.Code Ann. § 93-5-34 (Supp.2008). While the new statute provides that a service member's temporary duty, deployment or mobilization and the temporary disruption to a child’s schedule shall not be factors in determining whether a change of circumstances has occurred so as to transfer custody from the service member, nothing in the section ''alter[s] the duty of the court to consider the best interest of the child in deciding custody or visitation matters.”
 
 Id.
 
 Thus, in declaring the public policy of the State of Mississippi, the Legislature chose to keep "the best interest of the child” the paramount consideration. While the effect of military deployment can, in the future, not be a factor in determining whether a change of circumstances has occurred, there is no prohibition from considering the effect of military service in determining the best interest of the child.
 

 [13]
 

 . Again, the fact that the Jasper County property was titled in David's name is not determinative.
 
 Parsons,
 
 741 So.2d at 307(¶ 26).
 

 [14]
 

 . David was also awarded the home that he bought after he and Tammy separated, which was valued at $98,000 and deemed a non-marital asset.
 

 [15]
 

 . The chancellor stated that the investments were divided in the way they were so as to "eliminate the need for Qualified Domestic Relations Orders and with the acknowledgment that the PERS and Thrift Savings accounts are not readily transferable pursuant to a divorce.”
 

 [16]
 

 . David relies on
 
 Owen v. Owen,
 
 928 So.2d 156, 158(¶ 2) (Miss.2006), specifically the following quotation: "as a matter of fact that Kenneth ... [had] been the primary financial contributor to the assets of the marriage and that he should receive a greater percentage of any distribution of the marital assets.” However, this was stated by the chancellor, not the Mississippi Supreme Court, and on appeal, the supreme court reversed the judgment of the chancellor on the ground that the chancellor’s division of the marital assets was based
 
 too heavily on
 
 the husband’s financial contribution and because the chancellor provided no conclusions of law supporting why he awarded the husband sixty percent of the marital assets and the wife forty percent.
 
 Id.
 
 at 165(¶ 24).
 

 [17]
 

 .David also argues that the chancellor should have considered the fact that Tammy left David while he was on military leave in dividing the property; he contends this should have been considered an “other factor” under
 
 Ferguson.
 
 However, as noted above, the property distribution in this case, when viewed in its entirety, was entirely equitable; therefore, this argument is without merit.
 

 [18]
 

 . David does not challenge this computation of delinquency on appeal, just whether he was properly found to be in contempt.